[No. C045708. Third Dist. Mar. 28, 2006.]

JUDY NADLER et al., Plaintiffs and Appellants, v.
ARNOLD SCHWARZENEGGER et al., Defendants and Respondents.

DEAN ANDAL et al., Plaintiffs, v.
ARNOLD SCHWARZENEGGER et al., Defendants.

DENNIS KENNEDY et al., Plaintiffs, v.
ARNOLD SCHWARZENEGGER et al., Defendants.

1328

**COUNSEL**

Downey Brand, Matthew G. Jacobs and Jeffrey S. Galvin for Plaintiffs and Appellants.

Remcho, Johansen & Purcell, Robin B. Johansen, Kathleen J. Purcell, Thomas A. Willis and Margaret R. Prinzing for Defendant and Respondent California State Assembly.

Diane F. Boyer-Vine, Marian Johnston; Olson, Hagel & Fishburn, Lance H. Olson, Deborah B. Caplan and Erin V. Peth for Defendant and Respondent California State Senate.

## OPINION

**SCOTLAND, P. J.**—Every 10 years, in the year following the year in which the national census is taken, the boundary lines of California's Senatorial, Assembly, Congressional, and Board of Equalization districts are reapportioned to, among other things, reflect population shifts. (Cal. Const., art. XXI, § 1.) Our state Constitution assigns this task to California's Legislature, with participation of the Governor through the power to approve or to veto legislation. (*Ibid.*; *Legislature v. Reinecke* (1972) 6 Cal.3d 595, 601 [99 Cal.Rptr. 481, 492 P.2d 385].)

In 2001, the Legislature enacted, and Governor Gray Davis approved, reapportionment legislation. It put most residents of the City of Santa Clara in Assembly District 22, but a meandering district boundary through the city put some of its residents in Assembly District 24.

Unhappy with this division, a number of Santa Clara's residents, taxpayers, registered voters, and public officials (whom we will refer to as plaintiffs) brought this action, challenging the 2001 reapportionment of Assembly districts.[1] They allege that its separation of Santa Clara into two Assembly districts violates article XXI, section 1, subdivision (e) of California's Constitution, which states: "The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section." The trial court disagreed, and plaintiffs appealed.

As we will explain, that constitutional provision is the most flexible of the reapportionment standards and provides the greatest discretion to our state

---

[1] The action was brought against the Governor, the Secretary of State, the State Assembly, and the State Senate (whom we will refer to as defendants). Governor Arnold Schwarzenegger has been substituted for then Governor Davis, and Secretary of State Bruce McPherson has been substituted for then Secretary of State Bill Jones. Although the Governor and Secretary of State remain defendants, the opposition to the litigation has been provided by the Assembly and by the Senate.

The action was originally filed in the Superior Court of the County of Santa Clara. It was transferred to the Superior Court of the County of Sacramento for coordination with two other actions, *Andal v. Davis* (Super. Ct. of Sacramento County, 2003, No. 01CS01397), and *Kennedy v. Davis* (Super. Ct. of Sacramento County, 2003, No. 02CS01045), challenging the 2001 reapportionment legislation. The plaintiffs in *Andal v. Davis* and *Kennedy v. Davis* have not appealed from the trial court's decision.

Legislature. It plainly does not prohibit division of a city, county, or geographical region into different legislative districts. A reapportionment plan enacted by the Legislature and approved by the Governor is entitled to significant judicial deference. Such a plan is presumptively constitutional, and a party challenging the plan bears the burden of demonstrating it inevitably poses a total and fatal conflict with constitutional provisions. We agree with the trial court that plaintiffs have not met their burden here. Thus, we shall affirm the judgment.

## FACTS

The 2000 national census listed Santa Clara's population at 102,361. San Jose, with a population of 894,943, borders Santa Clara on the north, east, and south. Santa Clara also is bordered on the west by Sunnyvale, with a population of 131,760, and on the southwest by Cupertino, with a population of 50,546.

In 1991, the Assembly reapportionment divided Santa Clara at the Bayshore Freeway (Highway 101), which crosses the city in an east-west manner. Approximately 90 percent of Santa Clara's residents lived south of the Bayshore Freeway and were placed in Assembly District 22. Residents of Santa Clara who lived north of the freeway were placed in Assembly District 20.

When time came for the 2001 reapportionment, officials of Santa Clara wanted to keep the whole city within one Assembly district. Since Santa Clara's population was less than a quarter of the size of an Assembly district if California's population at that time were divided equally into 80 Assembly districts, the officials felt inclusion of the entire city in one Assembly district could be readily accomplished.

The national census is the basis for legislative apportionment. For reporting purposes, the national census utilizes units known as census tracts and census blocks. The 2000 census listed California's population at 33,871,648. This population was divided into 7,049 census tracts and 533,163 census blocks. Consequently, the average population size of a census tract was 4,805.17 persons, and the average population size of a census block was 63.53 persons. Among other things, the national census reports total population, voting age population, and race/ethnicity data with respect to census tracts and census blocks.

In preparation for the 2001 reapportionment, the Legislature contracted with the Institute of Governmental Studies, University of California, Berkeley, to merge census information with political data obtained from county

registrars. At the census block level, the political information contained such things as party registration and voting records in recent state and federal elections. The result is referred to as the "Statewide Database," which can be used with a computer program, such as "Maptitude for Redistricting," for drawing district boundaries at the census block level.

Hearings were held in locations throughout the state by the Assembly Committee on Elections, Reapportionment and Constitutional Amendments and the Senate Elections and Reapportionment Committee. After the hearings, the Legislature released a draft plan for Assembly reapportionment. It placed Santa Clara entirely within Assembly District 22, along with Sunnyvale, Cupertino, Mountain View, part of San Jose, and unincorporated areas of the county. (See appen. A.) However, the Legislature did not enact the draft plan.

In the plan ultimately enacted by the Legislature, slightly less than 80 percent of Santa Clara's population was placed in Assembly District 22, and the rest was put in Assembly District 24. This was accomplished by putting a small area on the east side of the city into Assembly District 24, and by running an irregular, peninsula-shaped finger of that district up from the southeast corner of the city toward its middle. (See appens. B & C.)

Plaintiffs brought this action to challenge the division of Santa Clara into two Assembly districts. In their view, such a division is unconstitutional unless dictated by strict necessity. Asserting that reapportionment by the Legislature should be subjected to heightened judicial scrutiny, plaintiffs believe that dividing Santa Clara was unnecessary to accomplish reapportionment and, thus, division of the city violates article XXI, section 1, subdivision (e), of our state Constitution.

The trial court held that the reapportionment plan enacted by the Legislature is entitled to judicial deference and that plaintiffs failed to establish the plan is constitutionally invalid.

## DISCUSSION

### I

Plaintiffs' complaint alleges, among other things, that in the reapportionment plan enacted by the Legislature, the Berryessa neighborhood of San Jose, which lies to the east of Santa Clara, was divided among four Assembly districts, the 20th, 22d, 23d and 24th. According to plaintiffs, the Berryessa neighborhood is home to a substantial Asian-American community, which comprises the majority of its residents. Thus, plaintiffs claim, "the Legislature

divided Santa Clara between Districts 22 and 24 to facilitate [its] plan to dilute this Asian-American community's voting strength and increase the number of Latino voters in Assembly District 23, thereby ensuring the electoral safety of that district's Latino incumbent."

This allegation suggests a federal equal protection of law challenge to the 2001 Assembly reapportionment plan.[2] However, plaintiffs did not make the required prima facie showing in the trial court and do not pursue such a claim on appeal.

Plaintiffs' challenge to the reapportionment plan relies solely upon article XXI of our state Constitution, which states: "Section 1. In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards: [¶] (a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district. [¶] (b) The population of all districts of a particular type shall be reasonably equal. [¶] (c) Every district shall be contiguous. [¶] (d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the State and ending at the southern boundary. [¶] (e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section."

II

Because the issue presented by plaintiffs is solely a matter of state law, it must be resolved pursuant to state principles of constitutional adjudication. While we will cite decisions of the United States Supreme Court for their persuasive value, in the end we resolve this case under state law.

---

[2] A state legislative districting plan that is based on race is subject to strict judicial scrutiny. (See *Miller v. Johnson* (1995) 515 U.S. 900, 920 [132 L.Ed.2d 762, 782, 115 S.Ct. 2475].) Courts must presume the Legislature acted in good faith. (*Id.* at p. 915 [132 L.Ed.2d at p. 779].) Thus, the party challenging the plan bears the burden of proving race-neutral considerations were subordinated to race in the drawing of electoral boundaries, i.e., that race was the predominant motivating factor. (*Id.* at pp. 916–917 [132 L.Ed.2d at p. 780].)

A claim that a districting plan unconstitutionally dilutes the votes of a political party (political gerrymandering) also presents a justiciable issue under equal protection principles. (*Davis v. Bandemer* (1986) 478 U.S. 109, 125 [92 L.Ed.2d 85, 100–101, 106 S.Ct. 2797].) However, the United States Supreme Court imposed a stringent standard for making a prima facie showing of political gerrymandering. It is not sufficient to show discriminatory intent and/or a lack of proportional representation. (*Id.* at pp. 127–129, 132 [92 L.Ed.2d at pp. 102–103, 105].) Rather, the complaining party must show continued frustration of the will of a majority of voters or effective denial to a minority of voters of a fair chance to influence the political process. (*Id.* at p. 133 [92 L.Ed.2d at p. 106].)

We begin by rejecting the suggestion of the Senate and the Assembly that this appeal should be dismissed because the issue presented is nonjusticiable.

■ *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205 [70 Cal.Rptr.2d 745] (hereafter *Schabarum*) discussed the "political question" rule, which, in rare instances, may require a court to refrain from addressing a challenge to legislative action. This rule arises out of the separation of powers in our tripartite system of government. (*Id.* at p. 1213.) Courts are limited to the judicial function—the resolution of cases and controversies—and may not usurp the functions of the legislative and executive branches. (*Ibid.*) Usurpation would include unwarranted intrusion into the roles of the executive and/or legislative branches. (*Ibid.*)

"Nevertheless, it is well established that it is a judicial function to interpret the law, including the Constitution, and, when appropriately presented in a case or controversy, to declare when an act of the Legislature or the executive is beyond the constitutional authority vested in those branches." (*Schabarum, supra,* 60 Cal.App.4th at p. 1213.) California's Constitution directs the Legislature to perform reapportionment and provides standards it must follow. (Cal. Const., art. XXI, § 1.) Where, as here, a claim is made that the reapportionment plan enacted by the Legislature does not conform to the dictates of our state Constitution, the issue is justiciable. (See *Silver v. Brown* (1965) 63 Cal.2d 270, 273–274 [46 Cal.Rptr. 308, 405 P.2d 132]; see also *Davis v. Bandemer, supra,* 478 U.S. at p. 125 [92 L.Ed.2d at pp. 100–101].)

### III

Before turning to the merits of plaintiffs' challenge to the reapportionment plan, we address their claim that the trial court committed reversible error in denying plaintiffs' request to take the deposition of William L. Cavala. The matter arose as follows.

In enacting the reapportionment plan, the Legislature provided: "Notwithstanding any other provision of law, any person challenging the validity or constitutionality of any provision of this act shall, within 30 days from the effective date of this act, and no later, petition the California Supreme Court for a writ of mandate, specifying the nature of the relief sought." (Stats. 2001, ch. 349, § 9.)

Plaintiffs timely filed such a petition for writ of mandate. In its preliminary opposition to the petition, the Assembly attached Cavala's declaration.[3] As

---

[3] The Assembly also attached a declaration of James F. Wisley, Chief Consultant to the Speaker of the California Assembly. No issue is presented on appeal with respect to Wisley.

the Senior Consultant to the Speaker in the Assembly's Office of Majority Services, Cavala was involved in providing proposals for the 2001 Assembly reapportionment. Cavala's declaration explained some of the considerations that went into redistricting in the region that includes Santa Clara. Plaintiffs responded that the declaration should be stricken because Cavala cannot properly testify to the motives of the legislators and, in any event, the subjective motivations of the legislators are not a proper subject for inquiry. The California Supreme Court summarily denied the petition for a writ of mandate.

Thereafter, while the matter was pending in the trial court, plaintiffs noticed the deposition of Cavala. Pointing out that, in the Supreme Court, plaintiffs had opposed the consideration of Cavala's comments regarding the 2001 reapportionment, the Assembly asserted the legislative privilege as to most of the questions plaintiffs wanted to ask Cavala.[4] This prompted plaintiffs to move to compel Cavala's deposition.

The trial court held that (1) by submitting Cavala's declaration to the Supreme Court, the Assembly waived the legislative privilege with respect to the contents of the declaration and, thus, plaintiffs could use any relevant parts of it as evidence, subject to objections on grounds other than privilege, but (2) unless the Assembly planned to use Cavala's declaration in this action, plaintiffs could not compel Cavala to submit to deposition testimony.

Asserting that the trial court erred in denying the motion to compel, plaintiffs argue the Assembly waived the legislative privilege and "opened the door to Mr. Cavala's deposition by voluntarily filing his detailed declaration with the California Supreme Court." In their view, the error was prejudicial because Cavala "had a unique insider's perspective on the redistricting process" such that his deposition testimony could have bolstered their case. The contention fails.

■ We are not here concerned solely with a question of privilege. We also confront the "more fundamental, historically enshrined legal principle that precludes any judicially authorized inquiry into the subjective motives or mental processes of legislators." (*County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 726 [119 Cal.Rptr. 631, 532 P.2d 495].) In this state, evidence that relates to the mental processes of individual legislators is "irrelevant to the judicial task." (*Id.* at p. 728.) Consequently, such evidence is

---

[4] The Assembly agreed there were some things to which Cavala could properly testify, such as population deviations in the plan, other statistics regarding the plan, or authenticating public documents that were part of the process. However, the Assembly objected to any questioning into legislative motives and communications between legislators and their staffs that are not part of the public record of legislation.

"not the proper subject of discovery requests." (*Schabarum, supra,* 60 Cal.App.4th at p. 1215, fn. 4; see *City of Santa Cruz v. Superior Court* (1995) 40 Cal.App.4th 1146, 1154–1155 [48 Cal.Rptr.2d 216] [rule applies to nonlegislators "so long as the questioning goes to legislators' thought processes"]; *Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616, 1623 [38 Cal.Rptr.2d 876].)

Thus, regardless of whether the Assembly waived the legislative privilege, this cannot alter the standard of review that courts apply in resolving constitutional challenges to legislation. Since court inquiry into the subjective motivations of members of the Legislature is precluded, whatever light Cavala might have been able to shed on such motivations is irrelevant to our judicial task. For this reason, the trial court did not commit prejudicial error in refusing to compel deposition testimony by Cavala.[5]

## IV

In rejecting plaintiffs' challenge to the reapportionment plan, the trial court said that its role was "to give deference to the [l]egislative process and to determine whether there was a reasonable basis for the Legislature's action. The Court is not to substitute its own judgment for that of the Legislature. The Legislature's determinations are entitled to great deference as long as they reflect a reasonable application of the Article XXI criteria and federal redistricting requirements. [Plaintiffs] have the burden of demonstrating a clear and unmistakable violation of those requirements and the Legislature's interpretation is entitled to deference in the absence of a showing that a particular provision has been unmistakably violated. Therefore, the 2001 plans carry a strong presumption of constitutionality and [plaintiffs] have not demonstrated a clear and unmistakable violation with respect to either the individual districts at issue or the plan as a whole."

Plaintiffs urge us to review de novo their challenge to the reapportionment plan and not to follow what they describe as the trial court's "overly deferential approach."

For reasons that follow, we conclude, as did the trial court, that a reapportionment plan enacted by the Legislature and approved by the Governor is entitled to significant judicial deference.

California's Constitution expressly commits the task of reapportionment to the Legislature. (Cal. Const., art. XXI, § 1.) In performing the judicial function,

---

[5] Plaintiffs say that "there is precedent for the receipt of testimony from legislative insiders." However, the cases they cite do not stand for the proposition that such an insider can testify about the subjective motivations of lawmakers when enacting legislation.

courts may not engage in unwarranted interference with the role of the legislative branch. (*Schabarum, supra,* 60 Cal.App.4th at pp. 1213–1214.) All intendments favor the exercise of the legislative authority, and courts must strictly construe constitutional restrictions or limitations on that authority; any doubt as to the Legislature's authority to act must be resolved in favor of its action. (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215]; *Schabarum, supra,* 60 Cal.App.4th at p. 1217.) Courts also "must defer to the Legislature's determination [that facts exist to support legislation] unless it is palpably arbitrary. [Citation.] Consequently, we must uphold the challenged legislation so long as the Legislature could rationally have determined a set of facts that support it. [Citation.]" (*Schabarum, supra,* 60 Cal.App.4th at p. 1220.) In addition, courts must presume that the Legislature's acts are constitutional (*id.* at p. 1219); the party challenging a legislative enactment bears the burden of proving it violates the Constitution. To meet this burden, the party must demonstrate that the enactment inevitably poses a present, total, and fatal conflict with applicable constitutional provisions, i.e., that no set of circumstances exists under which the enactment would be valid. (*Pacific Legal Foundation v. Brown, supra,* 29 Cal.3d at pp. 180–181; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166 [77 Cal.Rptr.2d 676].) The state is not required to justify the enactment.

On every occasion on which our state Supreme Court has been compelled to enter a reapportionment fray, it has indicated that the policies of "judicial restraint and deference to the Legislature" are applicable. (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 669 [180 Cal.Rptr. 297, 639 P.2d 939].) Indeed, as a practical matter, it would be very difficult to fairly consider challenges to a reapportionment scheme without according deference to the Legislature. The decision in *Wilson v. Eu* (1992) 1 Cal.4th 707 [4 Cal.Rptr.2d 379, 823 P.2d 545], demonstrates the inherent difficulty and necessary give and take that goes into developing a reapportionment plan. Quoting its opinion in *Legislature v. Reinecke* (1973) 10 Cal.3d 396, 403, the Supreme Court noted that redrawing specific district lines to " 'achieve possibly more reasonable results' " runs the " 'serious risk of creating undesirable side effects' " that could not be foreseen from a judicial perspective. (*Wilson v. Eu, supra,* 1 Cal.4th at p. 728.)

So, too, has the United States Supreme Court recognized that the difficulty of reapportionment requires that state legislatures be allowed the discretion necessary to balance competing interests. (*Miller v. Johnson, supra,* 515 U.S. at p. 915 [132 L.Ed.2d at p. 779].) Courts should not be "second-guessing what has consistently been referred to as a political task for the legislature, a task that should not be monitored too closely [by the courts]." (*Davis v. Bandemer, supra,* 478 U.S. at p. 133 [92 L.Ed.2d at p. 106].)

■ For these reasons, unless a complaining party makes a prima facie showing of an equal protection violation, a court adjudicating a constitutional challenge to a reapportionment plan must apply the standard applicable to constitutional challenges generally, i.e., deference to the Legislature's judgment.

V

According to plaintiffs, the undisputed facts in this case "compelled the preservation of Santa Clara in a single Assembly district." We are not persuaded.

■ Article XXI, section 1 of our state Constitution sets forth standards the Legislature must apply in enacting reapportionment legislation. California's Supreme Court summarized the standards as follows: "(1) consecutively numbered single-member districts, (2) 'reasonably equal' populations among districts of the same type, (3) contiguous districts, and (4) 'respect' for the 'geographical integrity of any city, county, or city and county, or of any geographical region' to the extent possible without violating the other standards." (*Wilson v. Eu, supra,* 1 Cal.4th at p. 714.) In addition, the supremacy clause of the United States Constitution requires that reapportionment take into consideration the federal principles of equal protection and the Voting Rights Act. (1 Cal.4th at pp. 714, 757.) Any other relevant criteria also may be given consideration (*id.* at p. 714); however, it may be impossible to completely fulfill all of them in all areas of California. (See *Silver v. Brown, supra,* 63 Cal.2d at p. 280.)

■ Respect for the geographical integrity of any city, county, or city and county, or of any geographical region (Cal. Const., art. XXI, § 1, subd. (e)) is the most flexible reapportionment standard, and it provides the greatest discretion to our state Legislature. (See *Silver v. Brown, supra,* 63 Cal.2d at p. 280.) It requires that political boundaries be respected, but it does not expressly prohibit division of a city into different districts. (See *Wilson v. Eu, supra,* 1 Cal.4th at p. 726.)

In providing that the geographical integrity of a city should be respected "to the extent possible," this standard recognizes that the reapportionment task is complicated by what is known as the " 'ripple effect,' whereby the casting of one district on the water produces ripples felt throughout the state. If uncontrolled, this effect may result in the initial choice of a perfect district in one place leading to intolerably imperfect districts elsewhere." (*Legislature v. Reinecke, supra,* 10 Cal.3d at p. 418, fn. 18.)

█ Because, as a practical matter, the reapportionment process involves give and take in resolving conflicts among the various standards and in considering the concerns, desires, and objections of numerous interested persons and groups (see *Wilson v. Eu, supra*, 1 Cal.4th at pp. 720–721), a result " 'which may appear ideal for one place or another must be subordinated to the goal of fair and reasonable reapportionment of the whole state. . . .' " (*Legislature v. Reinecke, supra*, 10 Cal.3d at p. 403.) Therefore, courts must approve a reapportionment plan if it appears to reflect a reasonable application of the standards, "even though alternatives . . . may appear equally reasonable." (*Legislature v. Reinecke, supra*, 10 Cal.3d at p. 403; see also *Wilson v. Eu, supra*, 1 Cal.4th at p. 720.)

In response to plaintiffs' challenge, defendants presented evidence to demonstrate some of the difficulties that inhere in reapportioning the area in which Santa Clara is located. The city is in the Santa Clara Valley. The valley is narrow and is bordered by the Santa Cruz Mountains to the west, the Diablo Range to the east, and the San Francisco Bay to the north. The San Francisco peninsula, a narrow body of land surrounded on three sides by the Pacific Ocean and the San Francisco Bay, runs northwest from the Santa Clara Valley. The City and County of San Francisco is at the tip of the San Francisco peninsula and has a population of about 42,000 persons less than would be needed to form two complete Assembly districts. In order to avoid the prospect of running district boundaries across a bridge to add population, the only possibility would be to run the boundaries south from San Francisco into other jurisdictions. This causes a ripple effect that runs down the peninsula into the Santa Clara Valley. Underpopulated districts encompassing East Bay communities also have a ripple effect that runs south into the Santa Clara Valley to converge with the San Francisco ripple effect.

Reapportionment in Santa Clara County is further complicated by the fact that Merced County is situated to the east and Monterey County is situated to the south. They are two of California's four covered jurisdictions that require federal preclearance pursuant to section 5 of the Voting Rights Act. Hence, the Legislature was required to take special care to ensure that district boundaries affecting those counties would be drawn in a manner to obtain federal preclearance. (*Wilson v. Eu, supra*, 1 Cal.4th at pp. 715–716.)

It also was shown there was a large and concentrated Latino population in San Jose. Under the 1991 reapportionment plan, Assembly District 23 included San Jose Latino neighborhoods and had a Latino population of 48.31 percent. In 2000, the district elected a Latino representative. During legislative hearings on the 2001 reapportionment, the Mexican American Legal Defense Fund submitted a proposal under which Assembly District 23 would have a Latino population of 48.54 percent. The Coalition of Asian

Pacific Americans for Fair Redistricting submitted a plan under which Assembly District 23 would have a Latino population of 48.37 percent.

In the reapportionment plan that the Legislature did not enact, the Latino population of Assembly District 23 was decreased to 43.49 percent. Defendants' experts believed this could have made the plan susceptible to a Voting Rights Act challenge. In the plan enacted by the Legislature, the Latino population of that district was 47.16 percent. The addition of Latino neighborhoods to the district set off a ripple effect in adjoining districts, most notably Assembly Districts 22 and 24. In the adjustments necessary to maintain population equality, Santa Clara was split, with some of its residents being placed in Assembly District 24.

In challenging the plan that was enacted by the Legislature, plaintiffs assume that only strict necessity would permit the split of a city in a districting plan. Claiming that "[t]he most powerful evidence in the record" is the draft plan which was not adopted, they argue the draft plan "unequivocally established that it was possible, within the meaning of Article XXI, subdivision (e), to keep Santa Clara whole." This is so, according to plaintiffs, because (1) the enacted plan did not serve to better equalize district populations over the draft plan, (2) the draft plan and the enacted plan were equally lawful with respect to the contiguity requirement, and (3) the changes from the draft plan to the enacted plan did not serve to unify any other city as a tradeoff for the split of Santa Clara.

The draft plan to which plaintiffs refer was not even a truncated product of the legislative process. The enactment of a reapportionment plan requires a majority vote in both houses of the Legislature and approval by the Governor. It does not appear that the draft plan was ever voted upon by either house of the Legislature. It was just as it is described, a preliminary draft plan to serve as the starting point for legislative consideration of reapportionment. It has no legal status and is certainly not binding upon the Legislature in any way. At most, it serves only to indicate that Santa Clara could have been kept whole in an alternative Assembly districting plan.

The California Supreme Court has twice indicated a reasonable, comprehensive reapportionment plan should not be rejected simply because equally reasonable alternative plans may be suggested. (*Wilson v. Eu, supra*, 1 Cal.4th at p. 720; *Legislature v. Reinecke, supra,* 10 Cal.3d at p. 403.) On those occasions, the court was considering the adoption of plans prepared by special masters. The policy of deference to a comprehensive, overall plan—and against judicial tinkering with individual districts at the behest of particular

persons or groups—is even stronger where, as here, the Legislature enacted and the Governor approved the plans under consideration. Accordingly, we conclude that the fact Santa Clara was not divided in the draft plan does not serve to condemn the plan that was enacted.

In plaintiffs' view, defendants' suggestion that the Voting Rights Act influenced the split of Santa Clara is unfounded.

■ First, plaintiffs argue that defendants' expert, Jonathan Katz, an associate professor of political science at the California Institute of Technology, did not participate in the redistricting process and lacked personal knowledge of actual legislative motivations. However, in considering a constitutional challenge to the reapportionment plan enacted by the Legislature, we may not go behind the legislation to consider the subjective motivations of the members of the Legislature and the Governor. (*Schabarum, supra*, 60 Cal.App.4th at pp. 1214–1215.) Our inquiry is limited to whether the Legislature could rationally have determined a set of facts that support the enacted plan. (*Id.* at p. 1220.) Katz's declaration would have been objectionable if he had purported to describe the actual subjective motivations of the legislators. But in describing facts and figures that would indicate the Legislature could have been concerned with Voting Rights Act issues, Katz followed appropriate methods of constitutional adjudication.

Plaintiffs also assert that defendants did not prove the Voting Rights Act required an increase in the Latino population of Assembly District 23 over that in the draft plan. They point to the decision in *Thornburg v. Gingles* (1986) 478 U.S. 30 [92 L.Ed.2d 25, 106 S.Ct. 2752] (hereafter *Gingles*) and argue that defendants failed to establish the factors required there for a Voting Rights Act challenge to the draft plan.

*Gingles* involved a challenge to use of multi-member districts. The Supreme Court said that unless there is a conjunction of three circumstances, the use of multi-member districts generally will not impede the ability of minority voters to elect representatives of their choice. (*Gingles, supra,* 478 U.S. at p. 48 [92 L.Ed.2d at p. 45].) Those circumstances are (1) the minority population is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) the minority is politically cohesive, and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. (*Id.* at pp. 50–51 [92 L.Ed.2d at pp. 46–47].)

The issue in this case is not as simple as applying the *Gingles* criteria. Because *Gingles* involved a challenge to a multi-member districting plan, it is not directly controlling with respect to our state's single-member districting

scheme. Moreover, the Supreme Court carefully noted it was considering a claim that the challenged plan inhibited the plaintiffs' ability to *elect* representatives of their choice, and that the court was expressing no opinion on whether a Voting Rights Act claim may be based on impairment of the ability to *influence* elections. (*Gingles, supra,* 478 U.S. at p. 46, fn. 12 [92 L.Ed.2d at p. 44, fn. 12].) The court also noted that it was not considering the criteria applicable to other types of vote dilution claims. (*Ibid.*)

The Supreme Court has not since determined whether influence-dilution claims are viable under the Voting Rights Act. (*Voinovich v. Quilter* (1993) 507 U.S. 146, 154 [122 L.Ed.2d 500, 511, 113 S.Ct. 1149].) But the court has recognized that (1) a minority group does not necessarily need to constitute a voting majority in a particular district in order to elect a minority candidate, (2) where a minority candidate is not elected, a minority group may nevertheless play a substantial if not decisive role in the electoral process, and (3) minority influence can be diluted to the extent that an elected representative can essentially ignore the interests of minorities, leaving them effectively unrepresented. (*Georgia v. Ashcroft* (2003) 539 U.S. 461, 480–482 [156 L.Ed.2d 428, 451–453, 123 S.Ct. 2498]; *Voinovich v. Quilter, supra,* 507 U.S. at pp. 151–152 [122 L.Ed.2d at p. 510]; *Gingles, supra,* 478 U.S. at p. 48, fn. 14 [92 L.Ed.2d at p. 45, fn. 14].)

Voting Rights Act claims require case-by-case adjudication. (*Voinovich v. Quilter, supra,* 507 U.S. at pp. 154–155 [122 L.Ed.2d at p. 512].) Such claims must be resolved upon the totality of the circumstances of the particular case. (*Ibid.*; 42 U.S.C. § 1973(b).) While a federal court cannot dictate the creation of a particular reapportionment scheme absent proof of a violation of the law, states are not so limited. (*Voinovich v. Quilter, supra,* 507 U.S. at pp. 156–157 [122 L.Ed.2d at p. 513].) States have the primary duty and responsibility for legislative reapportionment and must steer a middle course between dilution and overconcentration of minority voters. (*Ibid.*; *Wilson v. Eu, supra,* 1 Cal.4th at p. 724.)

In the reapportionment that followed the 1990 census, masters appointed by the California Supreme Court noted that section 2 of the Voting Rights Act has been the basis for scores of lawsuits. (*Wilson v. Eu, supra,* 1 Cal.4th at p. 745.) The masters believed it was important to eliminate, or at least to minimize, the possibility of a Voting Rights Act challenge to a redistricting plan. (*Wilson v. Eu,* at p. 745.) "The ultimate success of any such challenge would depend not only on the composition of the new districts themselves but also on evidence, not now before us, of historic voting patterns or socioeconomic data, and probably also on resolution of open legal questions concerning interpretation or application of the Act. Rather than speculating on such evidence, or attempting to resolve all such legal issues, we have

endeavored to draw boundaries that will withstand section 2 challenges under any foreseeable combination of factual circumstances and legal rulings." (*Ibid.*) The Supreme Court approved the masters' approach. (*Id.* at pp. 714–715.)

In performing the reapportionment task, the Legislature is entitled to at least as much leeway as the Supreme Court accorded to the masters in *Wilson v. Eu, supra*, 1 Cal.4th 707. Accordingly, we conclude the Legislature may properly adopt a reapportionment plan that minimizes the chance of a challenge based on the Voting Rights Act. In choosing one plan over a suggested alternative plan, the Legislature need not first prove the alternative necessarily would violate the Voting Rights Act.

In the final analysis, plaintiffs bore the burden of demonstrating that the reapportionment plan adopted by the Legislature and approved by the Governor inevitably poses a total and fatal conflict with applicable constitutional provisions. (*Pacific Legal Foundation v. Brown, supra*, 29 Cal.3d at pp. 180–181; *People v. Rodriguez, supra*, 66 Cal.App.4th at p. 166.) Giving appropriate deference to the Legislature's reapportionment role, we must agree with the trial court that plaintiffs failed to meet this burden.

## VI

Lastly, plaintiffs contend the trial court's statement of decision is inadequate. The contention fails.

The trial court issued a statement of decision that fully explained the court's reasoning in rejecting plaintiffs' challenge to the Legislature's reapportionment scheme and that is in close parallel to the reasoning set forth in this opinion. Thus, assuming that a statement of decision was required (but see *Schabarum, supra*, 60 Cal.App.4th at pp. 1219–1220 [it is a question of law whether a reapportionment plan enacted by the Legislature and signed by the Governor complies with the Constitution]; *Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 220–221 [48 Cal.Rptr.2d 661] [a statement of decision is not required when the issue is one of law rather than fact]), the trial court's statement sufficiently stated the grounds upon which its decision was based. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125 [94 Cal.Rptr.2d 579]; *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 524 [206 Cal.Rptr. 164].)

## DISPOSITION

The judgment is affirmed.

Davis, J., and Hull, J., concurred.

## APPENDIX

The Draft Plan

Appendix A

The Enacted Plan

Appendix B

District 24 in Santa Clara