NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DANIEL M. CONWAY, *Plaintiff/Appellant,*

*v.*

ARIZONA INDEPENDENT REDISTRICTING COMMISSION,
*Defendant/Appellee.*

No. 1 CA-CV 23-0062
FILED 7-13-2023

Appeal from the Superior Court in Maricopa County
No. CV2022-051078
The Honorable Alison S. Bachus, Judge, *Retired*

**AFFIRMED**

COUNSEL

Daniel M. Conway, Phoenix
*Plaintiff/Appellant*

Snell & Wilmer LLP, Phoenix
By Brett W. Johnson, Eric H. Spencer
*Co-Counsel for Defendant/Appellee*

Herrera Arellano LLP, Phoenix
By Roy Herrera, Daniel A. Arellano
*Co-Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

---

Judge Daniel J. Kiley delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**K I L E Y**, Judge:

¶1         Daniel M. Conway ("Conway") appeals the superior court's dismissal of his complaint challenging the legislative and congressional district maps adopted by the Arizona Independent Redistricting Commission (the "IRC") in 2022. Because Conway's complaint failed to state a claim for relief, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2         In November 2000, Arizona voters approved Proposition 106, which amended the Arizona Constitution by creating the IRC and assigning it the task of drawing boundary lines for the legislative and congressional districts. Ariz. Const. art. IV, pt. 2, § 1. In performing its assigned task, the IRC is required to adhere to specified procedures.

¶3         First, the IRC must create a map depicting "districts of equal population in a grid-like pattern across the state." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n (Redistricting I)*, 220 Ariz. 587, 597, ¶ 30 (2009) (citing Ariz. Const. art. IV, pt. 2, § 1(14)).

¶4         Next, the IRC must adjust the grid "as necessary to accommodate" six delineated goals. Ariz. Const. art. IV, pt. 2, § 1(14). The first goal "mandates that districts comply with the United States Constitution and the Voting Rights Act," while the second "requires that . . . districts have equal population to the extent practicable." *Redistricting I*, 220 Ariz. at 597, ¶ 32 (citing Ariz. Const. art. IV, pt. 2, § 1(14)(A)-(B)). The remaining four goals are that, to the extent practicable, (1) districts shall be geographically compact and contiguous; (2) district boundaries shall respect communities of interest; (3) district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts; and (4) establishing competitive districts should be favored when doing so would create no significant detriment to the other goals. Ariz. Const. art. IV, pt. 2, § 1(14)(C)-(F).

¶5        Third, the IRC must "advertise a draft map" of the districts "to the public for comment . . . for at least thirty days." *Id.* at § 1(16). Additionally, the IRC must consider any recommendations made by either or both houses of the legislature. *Id.* Finally, the IRC "must establish final district boundaries and certify the new districts to the Secretary of State." *Redistricting I*, 220 Ariz. at 600, ¶ 44 (cleaned up); *see* Ariz. Const. art. IV, pt. 2, §§ 1(16)-(17).

¶6        Throughout 2021, the IRC conducted a deliberative process to create the congressional and legislative maps at issue in this appeal. In preparation, the IRC undertook educational presentations and offered numerous public hearings. The mapping consultants considered only "total population census data that represent[ed] geographies from the census tract to the block level . . . so that every district had equal representation in terms of total population." Indeed, "[e]ach of the 9 Congressional Districts and 30 Legislative Districts" reflected on the initial grid maps had "equal population of plus or minus (+/-) one person." In September 2021, the IRC unanimously approved the congressional and legislative "grid maps," successfully completing the first step of the redistricting process.

¶7        After adopting the initial grid maps, the IRC conducted more public hearings, modifying the maps after considering thousands of comments from Arizona citizens and hundreds of proposed maps. The IRC completed the second step by adjusting the maps to accommodate the six constitutional goals, drafting and re-drafting a series of draft maps over the course of the process.

¶8        Upon the IRC's unanimous approval of the draft maps, the mapping consultants reviewed the maps "to confirm that each congressional and legislative district complied with all six constitutional criteria." The maps were then circulated to the public, and throughout November and December 2021, the IRC "held a series of townhalls, [public] hearings, and informational meetings to help educate Arizonans regarding the Draft Maps, solicit public comment, and maintain a high degree of transparency." This process exceeded the minimum 30 days allocated for public comment, thus completing the third step.

¶9        The IRC completed the final step in January 2022 when its members unanimously adopted the official congressional and legislative maps (the "Approved Maps") and certified them to the Arizona Secretary of State.

**¶10**        After the IRC adopted and certified the Approved Maps, Conway sued the IRC, challenging purported "deficiencies" in the Approved Maps and in the process used to create them. These deficiencies, he alleges, resulted in both "procedural violations" and "results violations" of "the Arizona Constitution as amended by Proposition 106." He asked that the court declare the Approved Maps unconstitutional and order that the maps he prepared be adopted in place of the Approved Maps. Conway later abandoned his request that the proposed maps he drafted be substituted in place of the Approved Maps but continued to challenge the constitutionality of the Approved Maps.

**¶11**        The IRC moved to dismiss under Arizona Rule of Civil Procedure ("Rule") 12(b)(6), asserting that Conway's claims amounted to nothing more than "a difference of opinion" over "discretionary mapping decisions" that are the "prerogative" of the IRC, which "acts as a legislative body," and so is entitled to judicial deference. After further briefing, the court dismissed Conway's complaint for failure to state a claim for relief.

**¶12**        After entry of final judgment, Conway timely appealed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), -2101(A)(1).

**DISCUSSION**

**¶13**        Conway challenges the superior court's dismissal of his complaint, asserting that his complaint identified "four separate areas of non-compliance with Arizona Constitutional requirements." We review the dismissal of a complaint under Rule 12(b)(6) *de novo. Coleman v. City of Mesa*, 230 Ariz. 352, 355, ¶ 7 (2012). Dismissal is appropriate if, as a matter of law, the plaintiff "would not be entitled to relief under any interpretation of the facts susceptible of proof." *Id.* at 356, ¶ 8 (citation omitted). "In determining if a complaint states a claim on which relief can be granted, courts must assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts, but mere conclusory statements are insufficient." *Id.* at ¶ 9.

**¶14**        Courts may not properly "direct how the [IRC] should change or improve [redistricting] plans" or "determine which of a number of proposed plans is superior." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n (Redistricting II)*, 211 Ariz. 337, 344 ¶ 17 (App. 2005). "Instead, judicial review is . . . confined to" resolving "constitutional challenges to the selected plans." *Id.* Resolving such constitutional challenges "involves a two part analysis to determine (1) whether the [IRC] followed the constitutionally mandated procedure and (2) whether the

4

[IRC] adopted a final plan that satisfies substantive constitutional requirements." *Redistricting I*, 220 Ariz. at 596, ¶ 24. Courts undertake that analysis in "the expectation that the legislature acts constitutionally." *Id.* at 595, ¶¶ 21-22 (cleaned up); *see also Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (recognizing that "redistricting and reapportioning legislative bodies is a legislative task" that courts "should make every effort not to pre-empt").

¶15　　　　Conway argues, first, that the IRC failed in its obligation to "commence[]" the "mapping process" by preparing "Grid-Like maps." Asserting that a "grid-like" map must bear "horizontal and vertical lines," Conway insists that the initial grid maps created by the IRC included "misshaped areas" that are insufficiently "grid-like." The IRC's failure to "correctly interpret the Grid-Like map requirement" at the outset, he argues, "direct[ly] cause[d]" the "remaining problems in the mapping process," resulting in a final product that shows "no pattern whatsoever," much less "a Grid-Like pattern." Pointing to his own proposed maps that "show districts formed with horizontal and vertical lines of approximately equal populations," he asserts that his proposed maps depict the requisite "grid-like pattern" better than the maps initially drawn by the IRC.

¶16　　　　As the superior court correctly observed, the Arizona Constitution does not state that the IRC must prepare initial maps that reflect "a grid of only horizon[t]al and vertical lines." On the contrary, the Constitution requires that the maps depict "a grid-like pattern," a term considerably less geometrically precise than the term "grid." We will not interpret "grid-like pattern" to require a rigidity that is not apparent from the plain language of the term. *See Sun City Home Owners Ass'n v. Ariz. Corp. Comm'n*, 252 Ariz. 1, 7, ¶ 25 (2021) ("We are obliged to interpret constitutional language according to its plain meaning.").

¶17　　　　Further, Conway's contention that the proposed district lines on the initial maps he drafted were more "grid-like" than the IRC's, even if true, is irrelevant. The initial mapping is intended as nothing more than a starting point for the redistricting process. Ariz. Const. art. IV, pt. 2, § 1(14); *cf. Nadler v. Schwarzenegger*, 41 Cal. Rptr. 3d 92, 102 (Cal. Ct. App. 2006) (noting that "a preliminary draft [redistricting] plan . . . serve[s] as the starting point for legislative consideration of reapportionment" but "has no legal status and is certainly not binding upon the Legislature in any way"). We presume that, when undertaking its duties, the IRC was aware of constitutional requirements and found its initial mapping sufficiently "grid-like" to constitute an acceptable starting point. *Redistricting I*, 220 Ariz. at 595, ¶ 22 ("A redistricting plan receives the same deference as we afford to other legislation."); *Roberts v. Spray*, 71 Ariz. 60, 70 (1950) (noting

that the legislature is "presumed to have known of and had in mind" applicable constitutional provisions when enacting legislation). For a court to second-guess the IRC's determination that the initial mapping was sufficiently "grid-like" would be to impermissibly intrude into what is necessarily a subjective and discretionary legislative determination. *Redistricting I*, 220 Ariz. at 598, ¶ 27 ("We cannot use the constitutional requirement that the [IRC] follow a specified procedure . . . as a basis for intruding into the discretionary aspects of the legislative process . . . ."). Just as a final, certified map is not unconstitutional merely because "another entity could offer a 'better' redistricting plan," *id.*, the IRC's initial grid mapping does not give rise to a constitutional claim merely because an alternative grid map depicting district lines in a more "grid-like pattern" could have been created. *See Jensen v. Ky. St. Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997) ("Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted.").

¶18        Conway further contends that the district lines drawn in the initial mapping should also "comply with as many" of the "secondary ideas" listed in Article 4, Part 2, Section 1(14)(A)-(F), of the Arizona Constitution "as possible." He asserts that, "to the extent practicable," the districts shown on the initial mapping should "be geographically compact and contiguous," "respect communities of interest," and be drawn "us[ing] geographic features." From there, he asserts that the IRC can then make further adjustments for the "other requirements" listed in Section 1(14) while "fine-tuning" its "final maps."

¶19        Conway's proposal is directly contrary to the plain wording of Section 1(14), which sets forth the step-by-step process that the IRC is to follow. Section 1(14) makes clear that the first step in the redistricting process is "the creation of districts of equal population in a grid-like pattern across the state." Only then may the IRC make adjustments to accommodate the six goals set forth in Section 1(14)(A)-(F). Because courts apply unambiguous constitutional text as written, *Ariz. Free Enter. Club v. Hobbs*, 253 Ariz. 478, 482, ¶ 10 (2022), we reject Conway's invitation to rewrite Section 1(14) to vary the order in which the IRC applies the relevant considerations.

¶20        Second, Conway asserts that the IRC failed to comply with its constitutional mandate to adjust the initial mapping to establish districts with "equal population to the extent practicable." According to Conway, "the precision in the Approved Congressional District map populations and the magnitude of differences in the Approved Legislative District map

6

populations both represent serious violations of the Arizona Constitution." Conway explains that the populations of the congressional districts on the Approved Maps are "more exact than the United States Supreme Court requirements" while the populations of the legislative districts "vary" excessively by "a total of 8.89%." Conway contends, in other words, that the population differences among the congressional districts in the Approved Maps are too small while the population differences among the legislative districts are too big.

¶21 We see nothing in the United States Constitution, the Arizona Constitution, or the Voting Rights Act that forbids the creation of congressional districts that are too equal in population. We therefore reject as baseless Conway's complaint that the population equality of the congressional districts on the Approved Maps is "more exact" than constitutionally necessary.

¶22 We likewise find no support in the law for Conway's challenge to the purportedly excessive variance in the populations of the legislative districts on the Approved Maps. Because "it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters," *Reynolds v. Sims*, 377 U.S. 533, 577 (1964), the United States Supreme Court has long held that federal law does not require that district populations be equalized with "[p]recise mathematical equality," *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). We see no reason why the Arizona Constitution should impose a more stringent standard of mathematical exactitude than is required by the United States Constitution or the Voting Rights Act. On the contrary, the "equal population to the extent practicable" requirement of Section 1(14)(B) is "as flexible as . . . federal requirements permit." *Redistricting I*, 220 Ariz. at 597, ¶ 32. Federal courts have long recognized population deviations of less than 10% to be too small, without more, to raise constitutional concerns. *Brown v. Thomson*, 462 U.S. 835, 842 (1983) ("[A] maximum population deviation under 10% falls within [the] category of minor deviations."); *Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998, 1009 (2002) ("[M]inor deviations of less than 10% from absolute equality among legislative districts are presumptively valid."). Accepted as true, Conway's assertion that the legislative districts vary by "a total of 8.89%," by itself, establishes nothing more than a minor variation warranting no relief.

¶23 Population variations of less than 10% may support a constitutional claim if the plaintiff establishes that the population differential resulted from a desire to disadvantage one group for the benefit of another or a similarly impermissible motive. *See Raleigh Wake Citizens*

7

*Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 342 (4th Cir. 2016) (holding that plaintiffs challenging redistricting plans "with population deviations below 10%" must establish "that improper considerations predominate in explaining the deviations"); *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1072 (D. Ariz. 2014) (recognizing that where "the maximum [population] deviation . . . is below ten percent, the burden is on plaintiffs to prove that the deviations did not result from the effectuation of legitimate redistricting policies."). Although Conway complains that the population variance of 8.89% in the Approved Maps' legislative districts is excessive, he does not allege that the variance is attributable to any impermissible motive. Accordingly, the superior court properly concluded that Conway failed to state a claim arising out of the population differences in the districts reflected on the Approved Maps.

¶24　　　　Third, Conway claims that the IRC "virtually ignored" the constitutional goal of "respect[ing] communities of interest" when drawing district boundaries. Opining that "what defines a community of interest are the common needs and problems residents share that can be addressed by government action," he states, "I believe that these [common needs and problems] closely follow geography." Thus, "mountain and desert areas, and rural and urban areas," Conway concludes, "represent communities of interest, and . . . should be so recognized in the redistricting process."

¶25　　　　We see no basis for Conway's contention that the term "communities of interest" should be limited to geographic considerations. On the contrary, the term may encompass communities and groups that share a variety of interests and characteristics. *Cf. Hall v. Moreno*, 270 P.3d 961, 971, ¶ 46 (Colo. 2012) (recognizing that redistricting goal of preserving communities of interest "seeks to create cohesive districts that are organized around similar ethnic, cultural, economic, trade area, geographic, and demographic factors") (cleaned up). It is within the IRC's discretion to consider all communities of interest and balance their interests against other constitutional goals. *Redistricting II*, 211 Ariz. at 363, ¶¶ 101-02 (recognizing that "we will not second-guess the [IRC's] determination to balance the Section 1(14) goals" so long as the IRC "had a reasonable basis and the manner of [district] selection was not clearly unconstitutional"). Further, Section 1(14)'s directive that the "potentially conflicting goals be balanced against each other" necessarily requires that courts be "quite deferential" in reviewing the IRC's weighing of such goals. *Redistricting I*, 220 Ariz. at 600, ¶ 48 (Hurwitz, J., concurring).

¶26　　　　The IRC conducted numerous public hearings, both before and after drafting the initial maps—a substantial undertaking—to elicit

feedback from Arizona citizens throughout the entire redistricting process. The report the IRC issued when it certified the Approved Maps reflects that the IRC "hear[d] extensively from citizens around the state regarding their own particular communities of interest" and received information from the official State Demographer and other experts regarding population and demographic trends in Arizona.[1] Indeed, the IRC Executive Director commented that the hearings provided "great feedback, [and] folks really appreciate[d] . . . the opportunity to share their thoughts and opinions on what their communities of interest are."

¶27　　　　Conway does not dispute that the IRC considered communities of interest but insists that the IRC should have prioritized geographic communities of interest over all others. A court cannot, however, substitute its judgment for that of the IRC's on discretionary matters. *See Redistricting I*, 220 Ariz. at 596, ¶ 27. And because a court's review is limited to whether the IRC "followed the mandated procedure," *id.* at ¶¶ 24, 26, and not the weight the IRC gave to subjective criteria, the superior court correctly found that it could not "second-guess the discretionary judgments that were made by the [IRC]." The court did not err when it concluded that Conway failed to state a claim upon which relief may be granted regarding the IRC's failure to construe the term "communities of interest" solely in geographic terms.

¶28　　　　Finally, Conway contends that the IRC did not sufficiently consider "visible geographic features, city, town and county boundaries, and undivided census tracts" in drawing district lines, resulting in "[t]he excessive splitting of Cities and Counties in both the Congressional and Legislative District" boundaries. Conway explains that the legislative district lines on the Approved Maps "split[] seven counties a total of fifteen times" while the proposed maps that he drafted split those counties only "thirteen times." Likewise, he goes on, the legislative district lines on the

---

[1] Although a court generally looks only to the pleadings in adjudicating a Rule 12(b)(6) motion to dismiss, *Coleman*, 230 Ariz. at 356, ¶ 9, the court here took judicial notice of the IRC's report without objection by Conway. We may therefore consider the IRC's report on appeal. *See Garrett v. Platt & Westby PC*, 1 CA-CV 20-0195, 2020 WL 7705607, at *2, ¶ 10 (Ariz. App. Dec. 29, 2020) (mem. decision) ("In reviewing a superior court's finding that a complaint failed to state a claim, this court looks to the pleading itself, as well as to documents properly considered by the superior court, including items for which judicial notice was taken."); *cf. State v. McGuire*, 124 Ariz. 64, 66 (App. 1978) ("An appellate court can take judicial notice of any matter of which the trial court may take judicial notice[.]").

Approved Maps "split" the City of Phoenix among "twelve districts" while his proposed maps divide Phoenix among only "seven districts."

**¶29** The IRC's report makes clear that the IRC did consider this constitutional goal in completing its work. Noting that its mapping consultants "advised that visible geographic features included landmarks such as rivers, canals, hills/mountains, historical roads, and railroad tracks" "helps voters understand the boundaries of their district," the IRC reported that it "made several changes to Draft Maps" to "draw lines using visible geographic features" and "political subdivision boundaries."

**¶30** Conway does not dispute that the IRC *considered* this constitutional goal but instead challenges the *conclusions* that the IRC reached. We cannot second-guess the IRC's judgment. *See id.* at 597, ¶ 28. "We cannot use the constitutional requirement that the [IRC] follow a specified procedure . . . as a basis for intruding into the discretionary aspects of the legislative process and then . . . base our review on whether we conclude that the courts or another entity could offer a 'better' redistricting plan." *Id.* at 596, ¶ 27. Accordingly, the mere "fact that a 'better' plan exists does not establish that [the IRC's] plan lacks a reasonable basis." *Id.* at 600, ¶ 46. The superior court correctly found that Conway failed to state a claim upon which relief may be granted here.

## CONCLUSION

**¶31** We affirm the superior court's dismissal of Conway's complaint for failure to state a claim against the IRC.

