SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| ARIZONA MINORITY COALITION FOR FAIR REDISTRICTING, an unincorporated association; RAMON VALADEZ; STATE REPRESENTATIVE PETER RIOS; CARLOS AVELAR; MARICOPA COUNTY SUPERVISOR, MARY ROSE GARRIDO WILCOX; ESTHER LUMM; VIRGINIA RIVERA; LOS ABOGADOS, an Arizona Corporation, ) ) ) ) ) ) ) ) ) ) ) | Arizona Supreme Court No. CV-08-0161-PR Court of Appeals Division One No. 1 CA-CV 07-0301 Maricopa County Superior Court No. CV2002-004380 |
| Plaintiffs/Appellees, ) ) | |
| v. ) ) | **O P I N I O N** |
| ARIZONA INDEPENDENT REDISTRICTING COMMISSION; STEVEN W. LYNN, in his official capacity as Chairman and a Commissioner thereof; ANDREA MINKOFF; in her official capacity as Vice Chairman and a Commissioner thereof; DANIEL R. ELDER, in his official capacity, as a Commissioner thereof; JOSHUA M. HALL, in his official capacity as a Commissioner thereof; JAMES R. HUNTWORK, in his official capacity as a Commissioner thereof, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants/Appellants. ) ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Kenneth L. Fields, Judge (Retired)

**VACATED AND REMANDED**
_____

Opinion of the Court of Appeals, Division One

219 Ariz. 50, 192 P.3d 409 (App. 2008)

**VACATED**

_____

PERKINS COIE BROWN & BAIN PA                                    Phoenix
      By    Paul F. Eckstein
            Charles A. Blanchard
            Rhonda L. Barnes

And

LEWIS AND ROCA LLP                                             Phoenix
      By    Richard A. Halloran
            Lawrence A. Kasten
            Kimberly A. Demarchi
Attorneys for Arizona Minority Coalition for Fair Redistricting,
Ramon Valadez, Carlos Avelar, Peter Rios, Mary Rose Garrido
Wilcox, Esther Lumm, Virginia Rivera, and Los Abogados

GAMMAGE & BURNHAM PLC                                          Phoenix
      By    Lisa T. Hauser
            Cameron C. Artigue

And

HARALSON MILLER PITT FELDMAN & MCANALLY PLC                    Phoenix
      By    Jose de Jesus Rivera
            Peter T. Limperis
Attorneys for Arizona Independent Redistricting Commission,
Steven M. Lynn, Andrea M. Minkoff, Daniel R. Elder, Joshua M.
Hall, and James R. Huntwork
_____

**M c G R E G O R**, Chief Justice

¶1      Arizona's Independent Redistricting Commission (the Commission) has the sole task of drawing congressional and state legislative districts.  The Arizona Constitution provides procedural and substantive guidance to the Commission.  This decision considers the nature of this guidance and the extent to

which a court can review Commission decisions.

I.

¶2      In November 2000, Arizona voters passed Proposition 106, a citizen initiative that amended the Arizona Constitution by removing the power to draw congressional and state legislative districts from the state legislature and reassigning this task to the newly created Independent Redistricting Commission. *See* Ariz. Const. art. 4, pt. 2, § 1(3) and historical notes.  The Commission consists of five volunteer commissioners appointed in a manner designed to assure diversity in political party affiliation and county of residence. *See id.* art. 4, pt. 2, § 1(3) to (8).  The Commission on Appellate Court Appointments nominates candidates for the Commission, *id.* art. 4, pt. 2, § 1(4), and commissioners are then appointed from this pool of candidates, *id.* art. 4, pt. 2, § 1(6), (8).  The Speaker of the House of Representatives appoints the first commissioner, followed, in order, by appointments by the minority leader of the House, by the President of the Senate, and by the minority leader of the Senate. *Id.* art. 4, pt. 2, § 1(6).  Then, by majority vote, the four appointed commissioners select the fifth commissioner, who serves as the chair of the Commission, from the remaining candidates in the nomination pool. *Id.* art. 4, pt. 2, § 1(8).  The commissioners then select one of their

3

members to serve as the vice-chair of the Commission. *Id.* art. 4, pt. 2, § 1(9). Commissioners are appointed in "years ending in one" and serve concurrent ten-year terms. *Id.* art. 4, pt. 2, § 1(6), (23).

¶3 The constitution permits no more than two members of the Commission to be from the same political party and requires that the fifth commissioner not be registered with any party represented on the Commission at the time of appointment. *Id.* art. 4, pt. 2, § 1(3), (8). Candidates must demonstrate a commitment to performing the Commission's charge "in an honest, independent and impartial fashion and to upholding public confidence in the integrity of the redistricting process." *Id.* art. 4, pt. 2, § 1(3). All Commission members must be registered Arizona voters who have been "continuously registered with the same political party or registered as unaffiliated with a political party for three or more years immediately preceding appointment." *Id.*

¶4 The Commission requires a quorum of three commissioners, including the chair or vice-chair, to conduct business, and the Commission can take official action only with three or more affirmative votes. *Id.* art. 4, pt. 2, § 1(12). To ensure transparency, the Commission must conduct its business "in meetings open to the public, with 48 or more hours public

notice provided." *Id.*

¶5        The sole task of the Commission is to establish congressional and legislative districts. *Id.* art. 4, pt. 2, § 1(14).  The Arizona Constitution directs the Commission to complete its task by following a specified procedure.  First, the Commission must create "districts of equal population in a grid-like pattern across the state." *Id.*  Working from that map, the Commission must next adjust the grid "as necessary to accommodate" six listed goals:

A.  Districts shall comply with the United States constitution and the United States voting rights act;

B. Congressional districts shall have equal population to the extent practicable, and state legislative districts shall have equal population to the extent practicable;

C.  Districts shall be geographically compact and contiguous to the extent practicable;

D. District boundaries shall respect communities of interest to the extent practicable;

E. To the extent practicable, district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts;

F.  To the extent practicable, competitive districts should be favored where to do so would create no significant detriment to the other goals.

*Id.*    The Commission must exclude "[p]arty registration and voting history data . . . from the initial phase of the mapping process[,]" but may use that data to "test maps for compliance

5

with the above goals." *Id.* art. 4, pt. 2, § 1(15). The Commission must "advertise a draft map" of both congressional and legislative districts to the public for at least thirty days to permit public comment. *Id.* art. 4, pt. 2, § 1(16). During the comment period, "[e]ither or both bodies of the legislature may . . . make recommendations to the independent redistricting commission[,]" and those recommendations "shall be considered by the independent redistricting commission." *Id.* The Commission then establishes final district boundaries. *Id.*

## II.

¶6      In May 2001, the Commission commenced the mapping process by creating a map with "districts of equal population in a grid-like pattern across the state" and adopting that map on June 7, 2001. *See id.* art. 4, pt. 2, § 1(14).[1] The Commission then held hearings during the next three weeks to solicit public input about the initial grid map. Between July 17 and August 17, 2001, the Commission adjusted the grid map to accommodate the first five of the six constitutional goals, but did not adjust for "competitiveness," the sixth goal.

---

[1]     The Commission is charged with developing district boundaries for congressional and legislative voting districts, but the Arizona Minority Coalition for Fair Redistricting challenged only the Commission's legislative map. Many of the steps in developing congressional and legislative districts overlap, but this recitation of facts focuses on those steps that implicate the legislative map.

6

¶7     On August 17, 2001, the Commission adopted a draft map. The Commission advertised this draft map for the constitutionally required thirty days and held another series of public hearings to obtain additional comment. After reviewing public comments and making further modifications to the draft map, on November 9, 2001, the Commission adopted a legislative map. It certified the legislative district boundaries and delivered the certification to the Arizona Secretary of State on November 15, 2001.

¶8     As required by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (2000), on January 24, 2002, the Commission submitted the legislative and congressional redistricting plans to the United States Department of Justice (DOJ) for preclearance.[2] The DOJ did not object to the congressional plan but, on May 20, 2002, denied preclearance of the legislative plan, stating that "the proposed plan, which results in a net loss of . . . districts . . . in which minority voters can effectively exercise their electoral franchise, is retrogressive." *See Beer v. United States*, 425 U.S. 130, 141

---

[2]     Pursuant to the Voting Rights Act, Arizona must submit any changes to voting practices or procedures within Arizona, including the creation of new legislative districts, to the DOJ or the United States District Court for the District of Columbia for "preclearance" prior to implementation. *See* 42 U.S.C. § 1973c.

(1976) (noting that the purpose of Section 5 is to "insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise").

¶9        In May 2002, the Commission developed an emergency interim legislative plan to address the DOJ objections.  On May 29, 2002, the United States District Court for the District of Arizona authorized use of the interim plan in the 2002 legislative elections.  *Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998, 1000-01 (D. Ariz. 2002).

¶10        In June 2002, the Commission adjusted the interim plan, taking into consideration all six of the constitutional goals, including competitiveness.  The Commission adopted a new draft map on June 25, 2002, and advertised that map to the public for thirty days.  Following the comment period and some final minor adjustments, the Commission adopted a final legislative district map on August 14, 2002.

¶11        On March 6, 2002, the Arizona Minority Coalition for Fair Redistricting and others (the Coalition) filed this action in superior court asserting that the legislative plan did not sufficiently favor competitive districts and therefore violated Article 4, Part 2, Section 1(14)(F) because it did not create

8

competitive districts when it was possible to do so.[3]  The Coalition alleged that the Commission's final map created "fewer, rather than more, competitive legislative districts" and it offered an alternative plan to better accomplish all the constitutional goals.

¶12     After a six-week bench trial in November and December 2003, the trial court concluded that the Commission had failed to favor the creation of competitive legislative districts and that this failure was arbitrary and capricious and a violation of section 1(14)(F).  In reaching its conclusions, the court placed significant weight on the existence of two alternative plans presented to the Commission.  The court found that both the "Hall-Minkoff Plan," developed by the Commission, and the "Hall-Modified Plan," submitted to the Commission by the Coalition, "allowed the Commission to create a greater number of competitive legislative districts without causing significant detriment to the other goals."  According to the trial court's findings, both alternative plans created seven competitive districts, whereas the Commission's August 2002 plan created only four competitive districts.  On January 16, 2004, the court ordered the Commission to adopt a new legislative plan that

---

[3]     The Coalition filed an amended complaint on October 16, 2002, challenging the August 2002 legislative district map.

would favor competitiveness and be at least as competitive as the Hall-Minkoff Plan or the Hall-Modified Plan.

¶13     The Commission appealed the trial court's ruling to the court of appeals and, in the interim, prepared a new legislative plan that the trial court approved on April 16, 2004. *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n (Redistricting I)*, 211 Ariz. 337, 343 ¶ 10, 121 P.3d 843, 849 (App. 2005). The court of appeals reversed the trial court's January 2004 judgment, holding that the "competitiveness goal is subordinate to [the] other goals listed in Section 1(14)(B)-(E), and the trial court erred by entering a contrary ruling."[4] *Id.* at 364-65 ¶ 113, 121 P.3d at 870-71. The court of appeals also reversed the trial court's April 2004 judgment approving the new redistricting plan and remanded to the trial court to decide whether the Commission violated Article 4, Part 2, Section 1(14) and (15) or the state or federal equal protection clauses.[5] *Id.* at 366 ¶¶ 120, 122, 121 P.3d at 872; *see also* U.S. Const. amend. XIV, § 1; Ariz. Const. art. 2, § 13.

¶14     On remand, the trial court again found that the

---

[4]     The court of appeals addressed additional issues not relevant to this decision.

10

Commission's August 2002 legislative plan violated Article 4, Part 2, Section 1(14) because the Commission did not sufficiently favor competitiveness. Once more, the trial court gave significant weight to the fact that more competitive maps were presented to the Commission, as well as to the fact that the Commission made only minor adjustments for competitiveness along the boundaries of the voting districts. The trial court found that the Commission "never favored competitiveness and never found that competitive districts were not practicable and/or would cause significant detriment to the other constitutional goals."

¶15     The Commission appealed. The court of appeals again reversed, this time observing that the Commission "considered competitiveness and made a finding that a more competitive plan would cause a significant detriment to the other five constitutional goals" and concluding that "the Commission's findings were supported by substantial evidence." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n* (*Redistricting II*), 219 Ariz. 50, __, __ ¶¶ 20, 26, 192 P.3d 409, 413, 414 (App. 2008).

¶16     The Coalition petitioned this Court for review and

---

[5]     The Coalition initially contended that the Commission's final redistricting plan violated the state and federal equal protection clauses, but has withdrawn that claim.

asked us to decide (1) whether the Commission must "favor" or merely "consider" competitiveness; (2) whether the Commission must include all six of the constitutional goals before advertising a draft map; (3) whether the Commission must make objective findings of significant detriment to the other constitutional goals when rejecting more competitive redistricting plans; and (4) whether the findings of the trial court are entitled to review under the clearly erroneous standard. We granted review to decide these recurring issues of statewide importance. *See* ARCAP 23(c). We exercise jurisdiction pursuant to Article 6, Section 5.3, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) section 12-120.24 (2003).

### III.

¶17    The level of judicial review afforded Commission enactments depends in large part on whether we regard the Commission as a "legislative body" or as a "constitutional administrative body." In *Arizona Independent Redistricting Commission v. Fields* (*Legislative Immunity Opinion*), the court of appeals treated the Commission as a "legislative body," *see* 206 Ariz. 130, 139 ¶ 24, 75 P.3d 1088, 1097 (App. 2003), but in *Redistricting II*, the court of appeals referred to the

12

Commission as a "constitutional administrative agency."[6]    219

Ariz. at __ ¶ 9, 192 P.3d at 411.   We must resolve this conflict

in the court of appeals' decisions to determine what standard of

review courts should employ when reviewing Commission actions.

**A.**

¶18      In the *Legislative Immunity Opinion*, the court of

appeals held that Commission members are entitled to legislative

privilege  because  the  Commission  performs  a  legislative

function.   206 Ariz. at 139 ¶ 24, 75 P.3d at 1097; *see also Lake

Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S.

391,  405  &  n.30  (1979)  (taking  a  functional  approach  to

legislative  immunity).   We agree  with  the  court  of  appeals'

conclusion that if an entity performs a legislative function,

courts  should  regard  that  entity  as  a  legislative  body.   *See*

*Legislative Immunity Opinion*, 206 Ariz. at 138-39 ¶¶ 20-24, 75

P.3d at 1096-97.   An entity's action is legislative if it bears

"the  hallmarks  of  traditional  legislation  .  .  .  [by]

reflect[ing] a discretionary, policymaking decision . . . [that]

may have prospective implications."   *Bogan v. Scott-Harris*, 523

U.S. 44, 55-56 (1998).

¶19      To determine whether the Commission is a legislative

---

[6]    Despite these conflicting court of appeals statements, on
review the parties agree that the Commission is a legislative
body.

13

body, therefore, we examine the nature of its acts.  The Commission's acts bear "the hallmarks of traditional legislation" in that commissioners exercise discretion and make policy decisions.  Commissioners do not merely implement established redistricting policy; rather, guided by the Arizona Constitution, they decide where to draw district boundaries.  In addition, Commission enactments carry the force of law and have prospective implications, other hallmarks of traditional legislation.  Finally, the Commission's function is one that a legislature traditionally performs.  Not only do enactments that carry the force of law traditionally originate in the legislature, but the process of redistricting is itself traditionally viewed as a legislative task.  The United States Supreme Court "has repeatedly held that redistricting . . . is a legislative task."  *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978).  Indeed, in Arizona, the legislature performed the task of redistricting until 2000.  Ariz. Const. art. 4, pt. 2, § 1(1) (amended 2000).  We conclude that the Commission acts as a legislative body.

## B.

¶20     We next address the standard that applies to judicial review of legislative acts.  Courts generally afford substantial

14

deference to legislative enactments.[7]  When reviewing a legislative enactment, courts exercise the deference that "we customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government."  *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319-20 (1985).  We do so not only because legislative enactments originate with a coequal branch of government, but also because that "institution 'is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon' legislative questions."  *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195-96 (1997) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665-66 (1994) (plurality opinion) (internal quotation marks omitted)).

¶21     Courts also operate under the expectation that "the legislature acts constitutionally."  *State v. Murphy*, 117 Ariz.

---

[7]     In some situations, the burden shifts to the government to demonstrate that a legislative enactment is constitutional. *See, e.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (content-based restrictions on speech are "presumptively invalid"); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1989) (racial classifications are "presumptively invalid"). These situations generally involve fundamental constitutional rights or distinctions based on certain suspect classifications. Although enactments of the Commission involve voting rights, which are generally considered fundamental rights, redistricting alone "does not affect 'the essence of the fundamental right' to vote," and thus does not eliminate the deference that courts generally afford to legislative enactments. *See Redistricting I*, 211 Ariz. at 348 ¶ 33, 121 P.3d at 854 (quoting *Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961, 975 (1984)).

15

57, 61, 570 P.2d 1070, 1074 (1977). The United States Supreme Court has observed that judging "the constitutionality of an Act of Congress [is] 'the gravest and most delicate duty that this Court is called upon to perform.'" *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J.)). Accordingly, "statutes are constitutional unless shown to be otherwise," *Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982), and "when there is a reasonable, even though debatable, basis for the enactment of a statute, we will uphold the act unless it is clearly unconstitutional." *Murphy*, 117 Ariz. at 61, 570 P.2d at 1074.

¶22    A redistricting plan receives the same deference as we afford to other legislation. *See Wise*, 437 U.S. at 539 (noting that the United States Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt"). "[J]udicial relief becomes appropriate only when a legislature fails to reapportion according to . . . constitutional requisites . . . ." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964). "[I]n the absence of any finding of a constitutional or statutory violation . . . , a court must defer to the legislative judgments the plans reflect

16

. . . ." *Upham v. Seamon*, 456 U.S. 37, 40-41 (1982).

¶23     Most challenges to redistricting plans question whether a plan violates the Equal Protection Clause. *See* U.S. Const. amend XIV, § 1. Whether asserting vote dilution, *see, e.g., Reynolds*, 377 U.S. 533, or racial gerrymandering, *see, e.g., Shaw v. Reno*, 509 U.S. 630 (1993), these equal protection claims generally involve the alleged deprivation of fundamental rights.[8]   When courts review such claims, we apply an elevated level of judicial scrutiny. *See supra* note 7.

¶24     Arizona's constitution, however, adds unique procedural and substantive requirements to the mandate that redistricting plans comply with equal protection principles. The Coalition's challenges in this case rest upon those provisions. Our review of the Commission's actions thus involves a two part analysis to determine (1) whether the Commission followed the constitutionally mandated procedure and (2) whether the Commission adopted a final plan that satisfies substantive constitutional requirements.

**IV.**

¶25     When considering the constitutionality of a legislative enactment, we usually limit our inquiry to testing

---

[8]     Similar claims also arise under the Voting Rights Act. *See, e.g., League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006).

17

the final enactment against constitutional requirements. *See, e.g.*, *State v. Stummer*, 219 Ariz. 137, 194 P.3d 1043 (2008) (analyzing hours-of-operation statute under free speech requirements); *State v. Casey*, 205 Ariz. 359, 71 P.3d 351 (2003) (analyzing burden of proof statute under due process requirements); *Aros v. Beneficial Ariz., Inc.*, 194 Ariz. 62, 977 P.2d 784 (1999) (analyzing consumer lender regulations under equal protection requirements). We typically do not examine the process the legislature follows in adopting statutes. The separation of powers required by Article 3 of the Arizona Constitution "prohibits judicial interference in the legitimate functions of the other branches of our government. We will not tell the legislature when to meet, what its agenda should be, what it should submit to the people, what bills it may draft or what language it may use." *Mecham v. Gordon*, 156 Ariz. 297, 302, 751 P.2d 957, 962 (1988).

¶**26** But when the voters adopted Proposition 106, they not only transferred the redistricting task from the legislature to the Commission, but also imposed a specific process that the Commission must follow in performing this task. *See* Ariz. Const. art. 4, pt. 2, § 1(14) to (16). Our review, then, must include an inquiry into whether the Commission followed the mandated procedure. If it did not, the Commission violated the

18

constitution as clearly as if it had violated the Equal Protection Clause by adopting legislation that lacks a reasonable basis.

¶27    We cannot use the constitutional requirement that the Commission follow a specified procedure, however, as a basis for intruding into the discretionary aspects of the legislative process and then, having intruded, base our review on whether we conclude that the courts or another entity could offer a "better" redistricting plan; doing so would impermissibly enlarge our role. *See, e.g.*, *In re Colo. Gen. Assembly*, 828 P.2d 185, 189 (Colo. 1992) ("The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court."); *Jensen v. Ky. State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997) ("Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted."); *Hartung v. Bradbury*, 33 P.3d 972, 980-81 (Or. 2001) ("In reviewing a plan of reapportionment, this court is not privileged to substitute its judgment about the wisdom of the plan. . . .    Rather, our task is to determine whether the Secretary of State has complied with [all applicable law]."); *In re Senate Bill 177*, 318 A.2d 157, 159 (Vt. 1974) ("Review by this Court will be limited to testing the

19

reapportionment by the appropriate constitutional and statutory standards, even in the presence of alternatives which give the appearance of better representation.").

¶28      In reaching their decisions, the commissioners perform legislative tasks of the sort we make every effort not to pre-empt. The Commission adopts its final map only after engaging in several levels of discretionary decision-making. The constitutional requirement that the Commission accommodate specified goals "to the extent practicable" recognizes that accommodating the various goals requires the Commission to balance competing concerns. This balancing necessarily requires the commissioners to exercise discretion in choosing among potential adjustments to the grid map. The Commission's need to balance competing interests typifies the political process, in which each commissioner may well define differently the "best" balance of these goals. Deciding the extent to which various accommodations are "practicable" also requires the commissioners to make judgments that the voters have assigned to the Commission, not to the courts. We therefore restrict this portion of our inquiry to determining whether the Commission followed the constitutionally required procedure in adopting its final redistricting plan.

## A.

¶29    To comply with the mandatory constitutional procedure, the Commission must complete several steps.  In *Redistricting I*, the court of appeals identified these steps as the four "phases" of the redistricting process.  211 Ariz. at 352 ¶ 53, 121 P.3d at 858.    That framework provides a useful tool to use in determining whether the Commission fulfilled the constitution's procedural requirements.

## B.

¶30    The parties agree that the first phase involves the creation of "districts of equal population in a grid-like pattern across the state."  Ariz. Const. art. 4, pt. 2, § 1(14); *Redistricting I*, 211 Ariz. at 352-53 ¶ 53, 121 P.3d at 858-59. The Coalition does not challenge the Commission's approach to this phase of its duties.

## C.

¶31    In the second phase, the Commission must make adjustments to the grid "as necessary to accommodate" the six constitutional goals.  Ariz. Const. art. 4, pt. 2, § 1(14); *Redistricting I*, 211 Ariz. at 353 ¶ 54, 121 P.3d at 859.

¶32    The first goal mandates that districts comply with the United States Constitution and the Voting Rights Act, and the second goal requires that congressional districts and state

21

legislative districts "have equal population to the extent practicable." Ariz. Const. art. 4, pt. 2, § 1(14)(A)-(B). These goals, which require compliance with the Federal Constitution and federal statutes, are only as flexible as the federal requirements permit, and compliance with these goals can be decided by a court as a matter of law. *See, e.g.*, *League of Latin Am. Citizens*, 548 U.S. at 425; *Reynolds*, 377 U.S. at 561. The Coalition does not challenge the Commission's compliance with these goals.

¶33    The Commission must also accommodate the remaining four goals "to the extent practicable." Ariz. Const. art. 4, pt. 2, § 1(14)(C)-(F). These goals require that "[d]istricts shall be geographically compact and contiguous," "[d]istrict boundaries shall respect communities of interest," "district lines shall use visible geographic features, city, town and county boundaries, and undivided census tracts," and "competitive districts should be favored where to do so would create no significant detriment to the other goals." *Id.* To successfully challenge the Commission's compliance with these goals, the Coalition must establish that during its deliberations, the Commission failed to take into account its obligation to accommodate these four goals to the extent practicable.

22

**¶34**        The Coalition challenges the Commission's compliance with the procedural requirements only with regard to competitiveness, the sixth constitutional goal.  To show that the Commission failed to follow the constitutionally mandated procedure as to this goal, the Coalition must establish that the Commission failed to engage in a deliberative effort to accommodate the goal.  If the record demonstrates that the Commission took this goal into account during its deliberative process, our procedural inquiry ends.[9]

**¶35**        The constitution directs the Commission to favor competitiveness when doing so is practicable and will not cause "significant detriment" to the other goals.  *Id.* art. 4, pt. 2, § 1(14)(F).  As the court of appeals noted in *Redistricting I*, the competitiveness goal is both mandatory and conditional:

> [I]f drawing competitive or more competitive districts would not be practicable or would cause significant detriment to the goals listed in subsections (B)-(E), the Commission must refrain from establishing such districts.  Conversely, if it would be practicable to draw competitive or more competitive districts and to do so would not cause significant detriment to the goals listed in subsections (B)-(E), the Commission must establish such districts.

---

[9]    Rather than apply this standard, the trial court made independent findings of fact, which the Coalition argues should have been reviewed under a clearly erroneous standard.  Because it is not for the courts to consider whether the Commission *might* have reached a different result or whether a more competitive map *could* have been created, the trial court erred in making these findings.  We therefore do not review the trial court's findings of fact.

23

211 Ariz. at 354 ¶ 59, 121 P.3d at 860. The direction that competitiveness should be favored unless one of two conditions occurs does not, contrary to the Commission's assertion, mean that the competitiveness goal is less mandatory than the other goals, can be ignored, or should be relegated to a secondary role. The constitutional language means what it says: The Commission should favor creating more competitive districts to the extent practicable when doing so does not cause significant detriment to the other goals.[10]

¶36 The record demonstrates that the Commission did engage in the required deliberative process in meetings open to the public. As the court of appeals pointed out, the Commission used three different statistical methods for measuring competitiveness: Judge It,[11] Arizona Quick and Dirty,[12] and voter registration records. *Redistricting II*, 219 Ariz. at __ ¶ 14, 192 P.3d at 412. The Commission also considered alternative

---

[10] Because the constitution does not establish primary and subordinate goals, we disagree with the court of appeals' observation that the unique restriction attached to this goal "plainly subordinates the competitiveness goal" to the other goals. *Redistricting I*, 211 Ariz. at 354 ¶ 59, 121 P.3d at 860.

[11] Judge It provides an advanced statistical analysis that predicts the potential outcome of an election based upon results from previous elections.

[12] Arizona Quick and Dirty is comprised of data extrapolated from the election results of three Arizona Corporation Commission races from the 1998 and 2000 general elections.

24

maps that would have increased competitiveness. *Id.* Minutes from the June 2002 meetings indicate that the Commission discussed ways to increase the competitiveness of each legislative district. The record is sufficient to establish that the Commission followed the mandatory constitutional procedure by attempting to accommodate the competitiveness goal, while taking into account whether greater competitiveness would cause significant detriment to the other goals.

¶37     The Coalition also argues that the Commission failed to make objective findings of significant detriment to the other goals. The constitution, however, does not impose such an obligation. In fact, the constitution does not require the Commission to record any specific information as evidence of its deliberation.[13]

¶38     We conclude that the Commission fulfilled its responsibility to attempt to accommodate all the constitutional goals during its deliberative process.

**D.**

¶39     The Coalition next asserts that the Commission failed

---

[13]     We note, however, that efforts by the Commission to develop a detailed record of the subject matter of their deliberations and to state clearly the reasons for reaching its conclusions will assist the public in understanding the Commission's decisions and will assist the courts in determining whether the Commission followed the mandatory procedure.

to comply with the constitutional direction that, during the third phase, the Commission must "advertise . . . a draft map of legislative districts to the public for comment . . . for at least thirty days." Ariz. Const. art. 4, pt. 2, § 1(16); *Redistricting I*, 211 Ariz. at 353 ¶ 55, 121 P.3d at 859. The Coalition argues that because the constitution required the Commission to adjust its map for competitiveness during "phase two" before it advertised the map for public comment during "phase three," the Commission's decision to advertise a draft map before it attempted to accommodate all the constitutional goals resulted in a constitutional violation.

¶40    The Coalition's argument depends upon an overly technical application of the court of appeals' four-phase analysis, which provides an analytic framework, but can neither add to nor subtract from constitutional requirements. The only constitutional requirement related to draft maps and public comment requires that a draft map be advertised to the public for at least thirty days. Ariz. Const. art. 4, pt. 2, § 1(16). The record demonstrates that, although the Commission followed a procedure different from that preferred by the Coalition, the Commission did meet this constitutional requirement.

¶41    Due in part to sequential legal challenges to the actions of the Commission, its advertisement of draft maps took

26

place over a considerable period. In 2001, the Commission held three weeks of public hearings after it adopted its initial grid map. In August 2001, after adjusting for the first five of the six constitutional goals, the Commission allowed another thirty-day comment period. At that point, the Commission had not adjusted for the competitiveness goal. Had the Commission's work ended at this point, we would conclude that the Commission advertised no map that resulted from Commission efforts to accommodate all constitutional goals, and therefore did not comply with the constitution. In addition, a substantial question would exist as to whether the record adequately demonstrated any effort to accommodate the competitiveness goal. But the Commission's drafting process did not end in the fall of 2001.

¶42 After the DOJ rejected the Commission's legislative map, the Commission adjusted its redistricting plan. When the Commission met in June 2002, the commissioners discussed all the constitutional goals, including the competitiveness of each legislative district, as well as the impact that any changes to district boundaries would have on other districts. The Commission then adjusted the map in an attempt to enhance

27

competitiveness.[14]  After making efforts to accommodate all the constitutional goals, the Commission again advertised a draft map to the public for the constitutionally mandated thirty days. By advertising this final draft map, the Commission complied with the publication and comment requirements of the map-drawing process.

¶**43**      Measured against this record, the Coalition's argument devolves to the assertion that the Commission may advertise a plan for public comment only after it has attempted to accommodate all constitutional goals.  We see nothing in the

---

[14]    The Coalition insists that the Commission had available and should have used a better methodology for determining the competitiveness of districts and that the Commission should have better utilized the competitiveness consultant it hired. Inquiries into the Commission's chosen method for measuring competitiveness, however, fall outside the scope of judicial review.  *See supra* ¶¶ 27-28.  The Coalition also asserts that when the Commission did accommodate competitiveness, the commissioners treated it "as mere fine tuning around the edges that would not be a dramatic change" from the Commission's previous draft map, and claims that the Commission rejected changes that would have increased competitiveness on an ad hoc basis.  Inquiring into that argument would lead us to an evaluation of the adequacy of the Commission's efforts to accommodate the competitiveness goal and the reasoning behind the Commission's rejections of additional changes in the map; those issues also fall outside the scope of judicial review. *See supra* ¶¶ 27-28.  Of course, mere pretextual deliberation about any of the goals would not satisfy the constitution, but the record in this matter does not support any claim that the Commission's deliberations were pretextual.  At most, the record shows that the Coalition and the Commission differed as to the use the Commission made of the information available to it and the weight the Commission should have attached to that information.

28

constitutional language that would lead us to conclude that the multi-step approach the Commission followed, which allowed public comment on more than one draft map, violates any constitutionally mandated procedure. The Commission must, of course, eventually advertise for public comment a map that incorporates Commission attempts to accommodate all the constitutional goals, but the Commission did that here.[15]

## E.

¶44 In the fourth and final phase of the mapping process, after the public comment period has ended, the Commission must "establish final district boundaries" and certify the new districts to the Secretary of State. *Id.* art. 4, pt. 2, § 1(16)-(17); *Redistricting I*, 211 Ariz. at 353 ¶ 55, 121 P.3d at 859. The Coalition does not challenge the Commission's approach to this phase of its duties.

## V.

¶45 Once we determine that the Commission complied with the procedural requirements of the constitution, the only remaining question for our review is whether the final district map complies with substantive constitutional requirements.

---

[15] During oral argument, the Commission observed that, with the benefit of experience, it would now recommend that the next Commission adjust its draft map to reflect all constitutional goals before advertising it for public comment.

Because this action does not involve the alleged deprivation of fundamental rights, we ask if the party challenging the redistricting plan demonstrated that no reasonable redistricting commission could have adopted the redistricting plan at issue. *See, e.g.*, *Aros*, 194 Ariz. at 67-68, 977 P.2d at 789-90; *Ariz. Downs v. Ariz. Horsemen's Found.*, 130 Ariz. 550, 556, 637 P.2d 1053, 1059 (1981); *see also Murphy*, 117 Ariz. at 61, 570 P.2d at 1074 ("[W]hen there is a reasonable, even though debatable, basis for the enactment of a statute, we will uphold the act unless it is clearly unconstitutional.").

¶46     We conclude that the Coalition did not meet its burden of establishing that the plan lacks a reasonable basis.  The Coalition's challenge largely rests on its contention that more competitive maps were presented to and rejected by the Commission.  Even if we accept those assertions as true, the fact that a "better" plan exists does not establish that this plan lacks a reasonable basis.  Although the Commission's decisions may be debatable, the Coalition did not show that no reasonable commission would have adopted this plan.

**VI.**

¶47     For the foregoing reasons, we vacate the opinion of the court of appeals, reverse the judgment of the trial court and remand to the trial court with instructions to enter

judgment in favor of the Commission.

_____
Ruth V. McGregor, Chief Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


**H U R W I T Z**, JUSTICE, concurring in all but Section IV(D) of the Court's opinion and concurring in the result

**¶48**     The Court today neatly describes the proper judicial role in reviewing decisions of the Independent Redistricting Commission.   When the Commission adjusts the grid map "as necessary to accommodate" the six constitutional goals in Article 4, Part 2, Section 1(14) of the Arizona Constitution, it acts, as the Court concludes, in a quintessentially legislative fashion. The Constitution requires that four potentially conflicting goals be balanced against each other "to the extent practicable." Ariz. Const. art. 4, pt. 2, § 1(14)(C)-(F).[16]   This directive

---

[16]     As the Court notes, goals (A) and (B) either expressly or implicitly mirror the requirements of the United States Constitution or federal statutory law, and compliance with these goals can be decided as a matter of objective law.  *See* ¶ 32, *supra*.

31

will almost inevitably lead to a final product in which none of these goals is achieved to the maximum possible extent. Our substantive review of the final Commission legislative maps for compliance with goals (C) through (F) therefore should be, as the Court teaches, quite deferential. Under that standard of review, I cannot conclude that the end result in this case violates the Constitution.

¶49     I also agree with the Court that, in adopting legislative maps, the Commission must follow the procedures mandated in subsections 1(14) and (16). Indeed, our substantive deference in review of the end product is, in my mind, a corollary of the Commission's adherence to the Constitution's procedural mandates. In transferring responsibility for decennial redistricting from the Legislature to a bipartisan Commission, the people necessarily recognized that the process involved a series of value judgments; they left those judgments to the Commission, but required that they be made through a specific process, so as to optimize consideration of the listed constitutional goals and minimize the partisan concerns that traditionally dominate redistricting efforts.

¶50     I part company with the Court's well-reasoned opinion only on one point. In my view, the Constitution does not allow the Commission to advertise a draft map without first making

32

adjustments for all six of the goals specified in subsections 1(14)(A) through (F). I do not believe the Constitution countenances the procedure used by the Commission here – first adjusting the grid only for goals (A) through (E), advertising a draft map, and then only after receiving public comments, turning to the goal of competitiveness.

## I.

¶51 The Constitution, as the Court recognizes, identifies four phases in the redistricting process. *See* ¶ 29, *supra*. After adopting an initial grid-like map of districts of equal population in phase one, the Commission undertakes phase two, in which "[a]djustments to the grid shall then be made as necessary to accommodate the [six] goals as set forth" in subsections (A) through (F). Ariz. Const. art. 4, pt. 2, § (1)14. In phase three, the Commission advertises the draft map resulting from the phase two adjustments and receives comment. *Id.* § (1)16. In phase four, final district boundaries are adopted. *Id.*

¶52 The Commission did not follow the constitutional roadmap here. Rather, in phase two it adjusted only for goals (A) through (E). The Commission then advertised the draft map, and only after receiving comments considered further adjustments for competitiveness. The Court concludes that no constitutional violation occurred because after adjusting for competitiveness,

33

the Commission advertised the adjusted map anew before final adoption.

¶53     The sequential requirements of subsections 1(14) and (16), however, are clear – after propounding the initial grid in phase one, the Commission is *required* in phase two to make necessary adjustments to serve all six constitutional goals. The Constitution plainly states that in phase two "[a]djustments to the grid *shall then* be made as necessary to accommodate" goals (A) through (F). Ariz. Const. art 4, pt. 2, § 1(14) (emphasis added). The Constitution thus requires that the adjustments be made before the phase three advertisement of the draft maps and does not contemplate that consideration of any of the goals be deferred.[17]

¶54     The Court suggests that such a constitutional construction is "overly technical." *See* ¶ 40, *supra*. But I would strictly construe the Constitution because its plain language serves an important purpose. Each of the five goals in subsections (B) through (F) must be accommodated "to the extent practicable." Ariz. Const. art. 4, pt. 2, § 1(14)(B)-(F). If

---

[17]    If the phase three advertising and comment lead to significant adjustments to the map, nothing in the Constitution prevents the Commission from advertising the map anew. My concern today is not that the Commission undertook steps in addition to those mandated by the Constitution, but rather that it did not complete phase two before undertaking phase three.

34

the Commission adjusts only for goals (B) through (E) in a truncated phase two and then adopts a draft map for advertisement, it will necessarily already have concluded that the draft map does the best job practicable of meeting those five goals. It will thus be quite difficult thereafter for the Commission to conclude that further adjustments to the map can be made to serve competiveness, which is only "favored where to do so would create no significant detriment to the other goals." Ariz. Const. art. 4, pt. 2, § 1(14)(F). Such a process inevitably threatens to relegate the competitiveness goal to precisely the "secondary role" that the Court correctly abjures. *See* ¶ 35 & n.10, *supra*.

¶55 The current Commission has wisely recommended that its successor adjust the draft map to reflect all constitutional goals before advertising it for public comment. *See* ¶ 43 n.15, *supra*. But such a recommendation has no binding effect. I would make clear that this procedure is not simply preferred, but rather mandated by the Constitution, and therefore cannot join Section IV(D) of the Court's opinion.

## II.

¶56 I nonetheless concur with the Court's ultimate disposition of this case. Only one cycle of legislative elections remains under the plan now at issue. As a practical

35

matter, it makes no sense to require a lame-duck Commission to begin the process anew for only one set of elections. I doubt that the constitutional procedures could be completed – and review by the Department of Justice finished – in time for the 2010 elections. Even ignoring time pressures, the product of such a process would necessarily be based on now well-outdated census data, resulting in districts malapportioned at birth.

¶57 In addition, as the Court notes, after the Department of Justice found that the Commission's initial plan did not pass Voting Rights Act muster, the Commission effectively was required to begin anew. *See* ¶ 10, *supra*. After an interim plan was adopted to meet the Department's concerns, the Commission adjusted the interim map, at least considering during that process all six constitutional goals. *Id*. The effect of the rejection of the initial plan was therefore to return the Commission to phase two, and the Commission's ostensible consideration of all six goals in the renewed process seems to satisfy the constitutional procedural framework. I therefore concur in the result.

_____

Andrew D. Hurwitz, Justice

36

CONCURRING:

_____
Garye L. Vásquez, Judge[*]

---

[*] Justice W. Scott Bales has recused himself from this case. Pursuant to Article 6, Section 3, of the Arizona Constitution, the Honorable Garye L. Vásquez, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.