PARIENTE, J.,
concurring.
“The people made the constitution, and the people can unmake it. It is the creature of their will, and lives only by their will.” So said Chief Justice John Marshall nearly two centuries ago. See Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 389, 5 L.Ed. 257 (1821). The Florida Constitution is “not a grant of power but a limitation upon power” of the government. In re Senate Joint Resolution of Legislative Apportionment 1176 (In re Apportionment Law — March 2012), 83 So.3d 597, 599 (Fla.2012).
In 2010, the people of this state passed Amendment 5 (the Fair Districts Amendment), which imposed significant limitations upon the power of the Legislature to apportion legislative districts. As adopted, those limitations, which are now codified in article III, section 21, of the Florida Constitution, were entitled “standards for establishing legislative district boundaries.” By approving the Fair Districts Amendment, the voters of this state clearly expressed that employing partisan favoritism to draw legislative districts was prohibited and that neutrality to partisan and incumbent interests was required.
Notwithstanding the goal of this new amendment, the structural and temporal constraints placed upon this Court by article III, section 16, of the Florida Constitution remained the same. In other words, the Fair Districts Amendment engrafted new and expansive standards onto an old constitutional framework unsuited for such inquiry. As explained by Justice Lewis in his concurring opinion in the prior proceeding, the thirty-day time limit was reasonable in 1968 given the very limited review envisioned by the drafters of the provision. See In re Apportionment Law — March 2012, 83 So.3d at 687 (Lewis, J., concurring). Yet, the structure meant to accommodate a limited review remains unchanged, despite the addition of extensive new standards that “dramatically altered] the landscape with respect to redistricting.” Id. at 607 (majority op.).
For the first time this year, the Legislature has had to adhere to the newly enacted constitutional standards and the first time this Court has had to interpret and apply the standards, presenting unique challenges for the Legislature, the opponents, and the Court. First, neither the House nor the Senate had the benefit of this Court’s interpretation of the constitutional standards before the initial plans were drawn. Second, the opponents did not have the assistance in the initial proceeding of this Court’s guidance on the importance of alternative plans in allowing this Court to perform a meaningful facial review.
This Court had a formidable task in the first round of redistricting to both inter *892 pret the newly enacted standards and then attempt to apply those standards in a meaningful way when reviewing the 120 House districts and the 40 Senate districts within thirty days. In this second-phase proceeding, during which this Court again has only thirty days, the Court was faced with the challenge of looking at the newly drawn districts and determining if the Senate adopted a new redistricting plan “conforming to the judgment of the supreme court.” Art. Ill, § 16(d), Fla. Const.
The Coalition and the FDP assert that the Court should re-examine all of the districts and that the Court has a separate constitutional obligation to review the plan for adherence to. the constitutional standards even if no one objects. Counsel for the FDP asserts that we have “total discretion.” I do not agree that this Court has “total discretion” to substitute its policy preferences for legislative decisions. Rather, this Court’s role is to determine whether a violation of the constitution has been established. See In re Apportionment Law — March 2012, 83 So.3d at 608 (“[Tjhis Court will defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.”).
I have concurred in the majority’s conclusion that each opponent has failed to satisfy its burden to demonstrate in this second-phase proceeding that the revised Senate plan violates Florida’s constitutional requirements. I write, however, to address barriers currently existing that appear to prevent the will of the voters from being fully realized. The first is time— specifically, the extremely strict time limitations under which the Legislature and this Court must both operate. The second is the process, in that an inherently political body is responsible for drawing the apportionment plans. The third is the standards set forth in the Amendment, which require this Court to discern the Legislature’s “intent,” a difficult inquiry even under more realistic time frames.
The voters have spoken that neutrality, and not partisan politics, must be the polestar of legislative apportionment. However, I am concerned that the constraints relating to the time, the process, and the standards in combination have prevented the will of voters as expressed by the passage of the Amendment from being fully effectuated.
TIME CONSTRAINT: TIME IS NOT ON OUR SIDE
First, I examine the temporal constraints, both on this Court and on the Legislature. This Court’s mandatory review, which must be undertaken within a restrictive thirty-day time frame, is not easily reconciled with determining intent and related issues. While we acknowledged that the Court’s role was “unquestionably circumscribed by the extremely short time frame set forth in article III, section 16(c), of the Florida Constitution,” we emphasized that “such a limitation cannot deter the Court from its extremely weighty responsibility entrusted to us by the citizens of this state through the Florida Constitution to interpret the constitutional standards and to apply those standards to the legislative apportionment plans.” In re Apportionment Law— March 2012, 83 So.3d at 599. Although the constitutional provision “must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied,” id. at 631 (quoting Lewis v. Leon Cnty., 73 So.3d 151, 153-54 (Fla.2011)), the limited thirty-day review makes it nearly impossible for the will of the people as expressed in the Fair Districts Amendment to be fully realized.
*893 Because the Court’s inquiry has greatly expanded with the passage of the Fair Districts Amendment, including an examination of legislative intent in drawing the district lines, the time limitations in our current constitutional framework are no longer suitable. Working within a strict time period, this Court is realistically not able to remand for fact-finding, which creates concerns that are compounded by the fact that the Court is constrained to the legislative record that is provided to it. As Justice Lewis has now twice observed, “[t]he parameters of our review simply do not allow us to competently test the depth and complexity of the factual assertions presented by the opponents.” Id. at 688 (Lewis, J., concurring) (quoting In re Constitutionality of House Joint Resolution 1987, 817 So.2d 819, 836 (Fla.2002) (Lewis, J., concurring)).
Time is therefore the first critical barrier to a more meaningful review, and those time limitations are apparent throughout the constitutionally mandated process — not just this Court’s review. In fact, rather than the Legislature being able to review and pass an apportionment plan shortly after the census data is received, the Florida Constitution actually prevents the Legislature from passing a joint resolution apportioning the state until “its regular session in the second year following each decennial census.” Art. Ill, § 16(a), Fla. Const. What this means in practical terms is that the Legislature could not meet in “regular session” to apportion the state until 2012, even though the decennial census data was completed and delivered to the State of Florida by the United States Census Bureau the previous year in mid-March 2011.[12] Therefore, even though the Legislature was able to conduct public meetings during 2011, which it did, and even though it had a number of staff working on the mechanics of the redistricting software and considering plans, the Legislature could not debate and pass a joint resolution until 2012. This delay compressed the process of apportionment, court review, and redrawing the lines into a few short months before the qualifying period for legislative candidates.[13]
In this case, the Legislature convened for its regular session on January 10, 2012. The Legislature did not pass its joint resolution until February 9, 2012, and the Attorney General filed the petition for declaratory judgment the very next day, February 10, 2012, requiring this Court to issue its final opinion within thirty days as provided by the constitution. Then, after this Court held on March 9, 2012, that the Senate plan was invalid, in accordance with the same constitutional framework, the Governor was required to and did convene a special session within five days, and the Legislature was then required to and did pass its new joint resolution within the mandated fifteen days on March 27, 2012. The Attorney General filed its petition on April 5, 2012, and this Court again had only thirty days to review and determine whether to approve or invalidate the new plan.
Throughout this entire process, the Court was reminded by the Secretary of *894 State, who filed comments in both cases, that the qualifying period for all legislative districts would commence on June 4, 2012, and would end on June 8, 2012, creating additional time pressures for this Court and continued uncertainty for the candidates seeking to run for the legislative districts.[14] In addition, Florida has five counties covered under Section 5 of the Federal Voting Rights Act, meaning that the Department of Justice or the District Court for the District of Columbia must undertake its own separate review and pre-clear the apportionment plans. It has become clear that the time frames that were placed in the Florida Constitution in 1968 are no longer realistic, especially in light of the newly enacted Fair Districts Amendment. Unless the process is changed, the Legislature, and this Court, will again in ten years be placed under these unrealistic time constraints.
Many of the other states do not have this long delay after the receipt of the decennial census data. For example, in New Jersey, the apportionment must be completed by a legislative apportionment commission shortly after receiving the census data. See art. IV, § 3, ¶ 1, N.J. Const. In fact, the majority of states (32 to be exact) completed the initial apportionment plans for legislative districts in 2011, some of which were later struck down by courts or amended.[15]
I would urge the Legislature in the next session and the Constitutional Revision Commission when it meets in 2018 to study the process with particular attention to the concerns of time. Unquestionably, a longer time frame in which the Legislature can debate and adopt a plan and this Court can review the plan would constitute a more orderly approach.
PROCESS CONSTRAINT: THE POLITICS OF REDISTRICTING
Next, I address the concerns of process. The Florida Constitution continues to place discretion in the Legislature to draw electoral districts, but simultaneously commands that the Legislature and individual legislators turn a “blind eye” to the effects of drawing the lines when doing so. In other words, the Fair Districts Amendment changed the standards governing the manner in which the Legislature accomplishes that task, adding an express prohibition against partisan and incumbent favoritism to eliminate the partisan nature of the apportionment process.
At oral argument, counsel for the Senate asserted that in light of the purpose of the Fair Districts Amendment, when the' Legislature apportioned the state into legislative districts, it was “not looking at red and blue.” That certainly was the intent behind the amendment. The question, however, is whether this purpose can be truly effectuated when a political body is the body tasked with drawing the plan.
Politics are a seemingly “inevitable” consideration entering into the apportionment calculus. In re Apportionment Law— March 2012, 83 So.3d at 616. If it is this *895 Court’s role to be the guardian of the constitution’s intent, I believe that changes must be made to the process to ensure that the purpose of the amendment — to take politics out of the apportionment equation — can be fully realized. In my view, it would be wise at this juncture to seriously examine the adoption of an independent apportionment commission to oversee this inherently political task. This is not a criticism of those who drew the plans, but simply an acknowledgment of the reality. “The desire of a political party to provide its representatives with an advantage in reapportionment is not a Republican or Democratic tenet, but applies equally to both parties.” Id. at 615. It is undeniable that the “raw exercise of majority legislative power does not seem to be the best way of conducting a critical task like redistricting, but it does seem to be an unfortunate fact of political life around the country.” Id. at 616 (quoting Martinez v. Bush, 234 F.Supp.2d 1275, 1297 (S.D.Fla.2002)).
The creation of an independent commission as a means to reform the process is not a novel concept. Other states have established independent redistricting commissions to redraw legislative districts. See, e.g., Ariz. Const, art. IV, pt. 2, § 1(3) (added by initiative measure in 2000); Cal. Const, art. XXI, § 2 (added by initiative measure in 2008); Idaho Const, art. Ill, § 2(2) (created in 1994); Wash. Const, art. II, § 43 (added by constitutional amendment in 1982). In fact, even in Florida, numerous proposals have been advanced, but never adopted, for the creation of such a commission over the years.
As far back as 1992 — almost two decades before the Fair Districts Amendment was approved by the voters of Florida— Justice Overton suggested that an “independent reapportionment commission” would be a “more efficient and less expensive process to develop a reapportionment plan.” In re Senate Joint Resolution 2G, Special Apportionment Session 1992, 597 So.2d 276, 286 (Fla.1992) (Overton, J., concurring). Similarly, members of the 1998 Constitutional Revision Commission, including Commissioner Evans-Jones and Judge Barkdull, submitted several proposals to amend the Florida Constitution by creating various types of independent commissions to apportion this state into legislative districts. See Fla. Const. Revision Comm’n, Proposal Nos. 85, 148, 162, 172, 177 (1998). Most recently, this Court reviewed a citizen initiative petition to amend the constitution to include tasking a commission with apportioning this state, but that initiative was struck from the ballot as having a misleading ballot summary and not containing a single subject. See Advisory Op. to Att’y Gen. re Indep. Nonpartisan Comm’n to Apportion Legislative & Cong. Districts Which Replaces Apportionment by Legislature, 926 So.2d 1218, 1225-26, 1229 (Fla.2006). Since that time, no similar initiative or proposal has resurfaced in this state. In my view, the time has come for this state to reevaluate the value of an independent apportionment commission.
STANDARDS CONSTRAINT: IS INTENT AN UNWORKABLE STANDARD?
Finally, I question whether an intent-based standard is the most effective for accomplishing the goal of the Fair Districts Amendment. As explained above, one of the overarching goals of the Amendment was to “require the Legislature to redistrict in a manner that prohibits favoritism or discrimination.” In re Apportionment Law — March 2012, 83 So.3d at 598 (quoting Advisory Op. to Att’y Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So.3d 175, 181 (Fla. 2009)). In furtherance of that goal, the *896 newly added standards include the requirement that “[n]o apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent.” Art. Ill, § 21(a), Fla. Stat. Importantly, this standard focuses on prohibiting drawing the districts with impermissible intent.
Intent is a difficult, although not impossible, inquiry. At least five other states share a similar constitutional or statutory requirement,[16] but case law from those states applying that standard has been scarce.[17] Given the nature of our review, this Court focused on “objective indicators of intent,” particularly adherence to the tier-two standards of equal population, compactness, and utilizing political and geographical boundaries where feasible. In re Apportionment Law — March 2012, 83 So.3d at 618.
Here, the opponents of the revised Senate plan point to the unbalanced effects of the plan as indicative of impermissible intent. Specifically, they contend that the partisan balance of the plan demonstrates a severe partisan skew in favor of the Republican Party. However, Florida’s amendment was intended to “prohibit[] intent, not effect.” Id. (emphasis added). As counsel for the Senate noted during oral argument, “there are going to be political consequences ... but the constitution does not prohibit adverse effect,” rather “[i]t prohibits adverse intent.”
The Coalition and the FDP point to elections results data from the redrawn Senate plan as demonstrating that the statewide partisan imbalance favors the Republican Party. Below is a comparison of the invalidated Senate plan, the redrawn Senate plan, the Coalition’s alternative plan, and the FDP’s alternative plan using the metrics of registered voters, the 2010 gubernatorial election, the 2008 presidential election, and the 2006 gubernatorial election.
Registered Voters:
Statewide:[18] 53% Democrat 47% Republican
Invalidated Senate: 18 Democrat (45%) 22 Republican (55%)
Redrawn Senate: 19 Democrat (47.5%) 21 Republican (52.5%)
Coalition: 20 Democrat (50%) 20 Republican (50%)
FDP: 21 Democrat (52.5%) 19 Republican (47.5%)
*897 2010 Gubernatorial Election:
Statewide:[19] 48% Sink (D) 49% Scott (R)
Invalidated Senate: 14 Sink (35%) 26 Scott (65%)
Redrawn Senate: 15 Sink (37.5%) 25 Scott (62.5%)
Coalition: 18 Sink (45%) 22 Scott (55%)
FDP: 17 Sink (42.5%) 23 Scott (57.5%)
2008 Presidential Election:
Statewide: 51% Obama (D) 48% McCain (R)
Invalidated Senate: 16 Obama (40%) 24 McCain (60%)
Redrawn Senate: 17 Obama (42.5%). 23 McCain (57.5%)
Coalition: 23 Obama (57.5%) 17 McCain (42.5%)
FDP: 21 Obama (52.5%) 19 McCain (47.5%)
2006 Gubernatorial Election:
Statewide: 45% Davis (D) 52% Crist (R)
Invalidated Senate: 13 Davis (32.5%) 27 Crist (67.5%)
Redrawn Senate: 12 Davis (30%) 28 Crist (70%)
Coalition: 13 Davis (32.5%) 27 Crist (67.5%)
FDP: 13 Davis (32.5%) 27 Crist (67.5%)
This partisan imbalance naturally raises questions. In this case, however, I ultimately agree with the majority’s conclusion that “[i]n light of the posture of this case, this Court’s direction in its prior decision, and the facts in this record,” the Coalition and the FDP have “failed to present new facts demonstrating the Legislature redrew the plan with an improper intent.” Majority op. at 882.
This does not mean that challenges on the basis of partisan imbalance should always be rejected in the future. The Florida Constitution mandates that “[n]o apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent.”- Art. Ill, § 21(a), Fla. Const, (emphasis added). Clearly, under the plain text of the constitutional provision, this Court may consider whether the overall plan was drawn with impermissible intent. In my view, there is certainly a point at which severe partisan imbalance will reflect impermissible intent. Defining that threshold for future cases, however, is a difficult undertaking. It is a challenging task to discern impermissible from neutral intent based on the data before this Court.
By comparison, Arizona has removed intent from the partisan-favoritism inquiry by instead requiring “competitive districts” to the extent practicable. As discussed in Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission, 220 Ariz. 587, 208 P.3d 676 (2009), the Arizona Constitution requires the commission drawing an apportionment plan to abide by the following principle: “To the extent practicable, competitive districts should be favored where to do so would create no significant detriment to the other goals.” Id. at 681 (quoting Ariz. Const, art. IV, pt. 2, § 1(14)). Further, the commission is required to exclude “[pjarty registration and voting history data ... from the initial phase of the mapping process!,]” but may use that data to “test maps for compliance.” Ariz. Const. IV, pt. 2, § 1(15). Other states’ laws mandate that districts shall not be drawn so as to unduly favor a person or political party without an express intent or purpose element.[20]
*898 Restricted to only a facial review of the Legislature’s intent, there will be times when this Court may seriously question the drawing of certain lines or the partisan balance of the plan but nevertheless uphold it because impermissible intent has not been proven based on the limited nature of the record before us. This is especially true because “any redrawing of lines, regardless of intent, will inevitably have an effect on the political composition of a district and likely whether a political party or incumbent is advantaged or disadvantaged.” In re Apportionment Law— March 2012, 83 So.3d at 617. Accordingly, given the strict time-frame under which we must necessarily operate and the limited record before us, the “intent” standard in the Fair Districts Amendment may ultimately serve to undercut the goal of the voters' in passing the Amendment.
CONCLUSION
The bottom line is that while the goal of the new amendment is laudatory, it is imperative that there be further exploration of the limitations of time, process, and the language of the “intent” standard. These issues are deserving of a closer look, with an eye toward assuring that the will of the voters can be fully realized. I urge the Legislature in the next session and the Constitutional Revision Commission when it meets in 2018 to study the process with particular attention to these concerns. Alternatively, the citizen initiative process could be employed once again to propose additional changes that would more completely effectuate the intent of the voters in passing the Fair Districts Amendment.

. Press Release, United States Census Bureau, Media Advisory — Census Bureau Ships Local 2010 Census Data to Florida (Mar. 16, 2011), http://2010.census.gov/news/releases/ operations/cbl l-cn94.html.

. As the comment filed by Secretary of State in this case explained, during the statutory qualifying period, each person seeking nomination or election to the Florida Legislature must file qualifying papers with the Department of State. § 99.061(1), Fla. Stat. (2011). Among the qualifying documents is a candidate oath identifying the specific legislative district sought by the candidate. § 99.06 l(7)(a)2„ Fla. Stat. (2011); R. 1S-2.0001, Fla. Admin. Code.

. The Secretary of State emphasized in this case that "[c]andidate qualifying is district-specific; a candidate cannot change districts after qualifying. A legally-enforceable apportionment plan for the Florida Senate must be in place before the qualifying period so that prospective candidates will be able to determine whether they will run for office and in which district they will be located.”

. Those states are Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, Nevada, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wisconsin.

.States that share a similar constitutional provision include California and Washington. See, e.g., art. XXI, § 2(e), Cal. Const. ("Districts shall not be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party.”); Wash. Const, art. II, § 43(5) (“The commission's plan shall not be drawn purposely to favor or discriminate against any political party or group.”). Idaho, Iowa, Montana, and Oregon codify similar provisions by statute. See Idaho Code § 72-1506(8) ("Counties shall not be divided to protect a particular political party or a particular incumbent.”); Iowa Code § 42.4(5) ("No district shall be drawn for the purpose of favoring a political party, incumbent legislator or member of Congress, or other person or group....”); Mont.Code § 5-1-115(3) ("A district may not be drawn for the purposes of favoring a political party or an incumbent legislator or member of congress.”); Or.Rev.Stat. § 188.010(2) ("No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person.”).

. One commentator has observed that "intent is difficult to identify and courts in other states have been reluctant to enforce similar criteria.” Michael P. McDonald, Redistricting Developments of the Last Decade — and What’s on the Table in This One, 10 Election L.J. 313, 315 (2011).

. Reflecting percentage of individuals registered with the two major parties.

. Reflecting percentage of overall statewide vote each candidate received.

. See, e.g., Haw. Const, art. IV, § 6 (“In effecting such redistricting, the commission shall be guided by the following criteria: ... 2. No district shall be so drawn as to unduly